[Cite as *State v. Poole*, 2019-Ohio-3366.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                 :

    Plaintiff-Appellee,                 :

                                No. 107829

    v.                                              :

REGINALD POOLE,                              :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 22, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-615488-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Buckeye Law Office, and P. Andrew Baker, *for appellant.*

LARRY A. JONES, SR., J.:

{¶ 1} Defendant-appellant Reginald Poole ("Poole") appeals his rape and kidnapping convictions, which were rendered after a bench trial. For the reasons below, we affirm.

**Procedural History**

{¶ 2} In March 2017, Poole was charged in a four-count indictment. Count 1 charged rape in violation of R.C. 2907.02(A)(2), that is, that Poole "did engage in sexual conduct, to wit vaginal intercourse, with Jane Doe by purposely compelling her to submit by force or threat of force." Count 2 charged rape in violation of R.C. 2907.02(A)(1)(c), that is, that Poole "did engage in sexual conduct, to wit vaginal intercourse with Jane Doe" who was not his spouse and the "ability of Jane Doe to resist or consent was substantially impaired because of a mental or physical condition * * * and [he] knew or had reasonable cause to believe that Jane Doe's ability to resist or consent was substantially impaired * * *." Counts 1 and 2 contained notices of prior conviction and repeat violent offender specifications.

{¶ 3} Count 3 charged kidnapping in violation of R.C. 2905.01(A)(4), alleging that Poole "did, by force, threat, or deception, purposely remove Jane Doe from the place where she was found or restrain [her] liberty for the purpose of engaging in sexual activity * * * with Jane Doe against her will." Count 4 charged kidnapping under R.C. 2905.01(A)(2), alleging that Poole "did, by force, threat, or deception, purposely remove Jane Doe from the place where she was found or restrain [her] liberty for the purpose of facilitating the commission of a felony, to wit rape, R.C. 2907.02 or flight thereafter." Counts 3 and 4 contained notices of prior conviction, sexual motivation, and repeat violent offender specifications.

{¶ 4} Prior to trial, Jane Doe's name was amended to reflect the victim's name, A.T. At trial, the state presented eight witnesses and admitted numerous

exhibits into evidence. At the conclusion of the state's case, Poole made a Crim.R. 29 motion for judgment of acquittal, which the trial court denied. Poole then presented three witnesses and also admitted exhibits into evidence. At the conclusion of the presentation of all the evidence, Poole renewed his Crim.R. 29 motion, which was again denied.

{¶ 5} After its deliberations, the trial court found Poole guilty of all counts and specifications. After merging Counts 1 and 2 and Counts 3 and 4, the trial court sentenced Poole to 11 years on both Counts 2 and 3, as elected by the state, and ordered them to be served consecutive to each other, for an aggregate prison term of 22 years.

**Trial Testimony**

{¶ 6} The incident giving rise to this case occurred in December 2016, and began and ended in downtown Cleveland. City street cameras and cameras from the downtown casino captured some of the incident and were admitted into evidence.

{¶ 7} The victim, A.T., testified that on the evening in question she went out with an old high school friend. She had a boyfriend at the time, who was planning on being downtown at the "Q" for a hockey game, but the two had not planned to meet that evening. A.T. drove herself and her friend to the downtown casino in her white Jeep Patriot. A.T. testified that she was wearing "very tight-fitting [white] skinny jeans," a long sleeve black shirt, a white jacket, and high heels.

{¶ 8} A.T. remembered drinking four or five shots of straight vodka and two vodka martinis, which she described as a "ton of alcohol" for her. A.T. testified that

she could have had more alcohol than that, but she did not remember. On a scale of one to ten, she described herself as being a ten in terms of how inebriated she was — the drunkest she had ever been.

{¶ 9} A.T. testified that the next thing she remembered from that evening was waking up in a stranger's car and that she had on gray sweatpants and a pair of men's boxer shorts. She was afraid, but tried to "befriend" the stranger. She asked for his cell phone, under the guise of wanting to listen to music. The man gave her his phone, and A.T. dialed 911 and held the phone to the side as the man drove. A.T. did not say anything to the 911 operator and eventually the call ended. The 911 operator called the number and the man answered his phone and told the operator that he had not called 911. The man then called A.T. a "bitch" and said she was going to get him in trouble.

{¶ 10} The man dropped A.T. off on West 2nd Street, two blocks from the casino; it was captured by a street camera. A.T. was wearing gray sweatpants that were too big and she was holding up. She did not have shoes on, and ran to the casino. Once inside the casino, A.T. tried to take the bottom clothing off, because as she testified, she felt "disgusted" being in someone else's clothing. Video from the casino captured her — she appeared distraught and, at times, unsteady.

{¶ 11} A.T. was unable to describe the strange man, both that evening and at trial. She did not remember how she got in the stranger's car, or what happened to her while she was in the car.

{¶ 12} Several of the other state's witnesses filled in the gaps. A.T.'s boyfriend testified that, as mentioned, he and A.T. did not have plans to get together that evening. But A.T. called him around 11:00 p.m., which surprised him. A.T. asked him to meet her and her friend, which he did. According to the boyfriend, A.T. was already intoxicated when he meet up with her and her friend, but she continued to drink. He described her as being a "ten drunk" — the most intoxicated he had ever seen her.

{¶ 13} When they were ready to go home for the evening, the boyfriend, A.T., and her friend left in A.T.'s car (the white Jeep), which the boyfriend drove due to A.T.'s state. As he was driving, A.T. and her friend started fighting inside the car. When he stopped the car at the intersection of East 4th Street and Prospect Avenue in downtown Cleveland, the fight spilled out onto the street. A street camera captured the incident. In addition to A.T., her friend, and her boyfriend, three bystanders were on scene. None of the bystanders nor the main people involved in this incident knew each other. The bystanders were a male and two females, and all three of them testified at trial.

{¶ 14} The bystanders were crossing the street at the intersection of East 4th Street and Prospect Avenue as they were walking to their car when a car (later determined to be Poole's car) turned right in front of them. After they crossed the street, they heard arguing coming from the white Jeep. One of the female bystanders went over to the Jeep to see if she could lend assistance. The female bystander was focused on helping one of the Jeep's occupants, A.T., whom the

bystander determined was "extremely intoxicated." The bystander believed A.T. was intoxicated almost to the point where she thought her stomach would need to be pumped.

{¶ 15} While the female bystander was trying to help A.T., a male (later identified as Poole) came "out of nowhere" and said that A.T. was drunk and needed help. Poole picked A.T. up and "cradled her like a baby." Poole then commented that A.T. was "peeing" on him. Poole put A.T. down, walked her back to his car, and put her in it. The female bystander assumed that Poole was an Uber driver who had been called to take A.T. home. So she was not alarmed by the situation and continued to help the rest of the group (A.T.'s boyfriend and friend) by moving the Jeep out of the roadway. After moving the Jeep and returning to the scene, A.T.'s boyfriend and friend were gone. The bystander kept the keys to the Jeep and turned them in to the police the next day.

{¶ 16} The other female bystander testified that she saw Poole with the group by the Jeep and, because of his "calm demeanor," she assumed he was with the group. But as soon as she saw Poole sped off with A.T. in his vehicle, and A.T.'s boyfriend realized what had happened, the scene became chaotic and she realized something was wrong.

{¶ 17} Much of the scene was captured on a street camera. In the video, Poole can be seen walking over to the Jeep, picking up A.T. and cradling her. He put her down, and then began walking her away from the Jeep. When he had her a little distance away from the Jeep, he picked her up again and went out of view.

{¶ 18} A.T.'s boyfriend testified that once he realized that A.T. had been taken, he ran after Poole's car, but was unable to catch it. He then walked back to the casino where he flagged down a police officer. While he was with the officer, he received a call from a number that he did not recognize and which his caller identification showed was from Denver, Colorado. He called the number but there was no answer.

{¶ 19} A.T.'s boyfriend testified that about an hour later, A.T. showed up at the casino. He had no idea how she got there, but she looked "a mess," was "erratic," and "crying and screaming that she had been raped." She was wearing a pair of men's boxer underwear and sweatpants and was screaming to get the clothes off of her.

{¶ 20} The video evidence demonstrated that Poole took A.T. from East 4th Street and Prospect Avenue around 1:30 a.m. A.T. went back to the casino around 2:40 a.m.

{¶ 21} A.T. was examined at a hospital by a sexual assault nurse examiner ("SANE nurse"). A.T. was unable to recall many of the details of the incident to the nurse. She told the nurse that she only remembered being in a car, using someone's cell phone, and then waking up wearing someone else's boxer shorts and pants. A.T. told the SANE nurse that she did not recall any sexual activity.

{¶ 22} The nurse testified that she observed and photographed bruising on wounds on A.T.'s knees, ankles, heels, and hip; the photographs were admitted into evidence. The injury to one of her ankles required an x-ray. The nurse testified that

A.T.'s right ankle, which was bloody, looked like it had been "sheared," "as if her skin was scraped off of her heel." The SANE nurse collected DNA swabs from A.T.'s mouth, vagina, and fingernails.

{¶ 23} A DNA analyst from the Cuyahoga County Regional Forensic Science Lab tested the swabs and testified at trial. The analyst found the presence of Poole's seminal fluid (i.e., fluid that can only come from the male prostrate organ), as confirmed through a P-30 test on A.T.'s vaginal swabs.

{¶ 24} Detective Christina Cotton ("Detective Cotton") of the Cleveland Police Department was the lead detective on the case. As part of her investigation, she determined that the phone from which a call was placed to A.C.'s boyfriend's phone on the day in question was linked to a phone belonging to Poole. Specifically, the phone belonged to a business named Herold's Salads. A representative from the business informed Detective Cotton that the phone was given to Poole, who was an employee of the business. Detective Cotton obtained the records for the phone. The records showed that, on the day in question, a 911 call was placed from the phone at 2:17 a.m. Two calls were also made to A.T.'s boyfriend's phone, one at 2:14 a.m. and the other at 2:16 a.m.

{¶ 25} As mentioned, Poole presented three witnesses on his behalf — his defense was that he was a "good Samaritan" who only tried to get help for A.T. and did not have sex with her.

{¶ 26} His first witness was Dr. Julie Heinig ("Dr. Heinig"), a DNA analyst. Dr. Heinig testified that the existence of Poole's DNA in the vaginal swabs could have

been because of a transfer in clothing. She also testified that although Poole's seminal fluid was present in the vaginal swabs, there was no sperm that could be confirmed. There was sperm found in the boxer shorts A.T. had on, and according to Dr. Heinig, it was possible that sperm got into A.T.'s vagina from the shorts.

{¶ 27} The second and third witnesses were from Poole's place of employment. Together, they testified that on the evening of the incident the business had a holiday party at the downtown casino, and appellant was in attendance. According to one of the coworkers, Poole was supposed to give another coworker a ride home, but "disappeared" without doing so.

{¶ 28} On this evidence the trial court found Poole guilty of all counts and specifications.

## Assignments of Error

I.  Defendant-appellant's convictions were not supported by sufficient evidence.

II.  Defendant-appellant's convictions were against the manifest weight of the evidence.

III.  Defendant-appellant's conviction for kidnapping, if permitted to stand, must be modified to that of a second-degree felony.

## Law and Analysis

## Sufficiency and Weight of Evidence

{¶ 29} In his first assignment of error, Poole contends that his convictions were not supported by sufficient evidence. In his second assignment of error, he

contends that the convictions were against the manifest weight of the evidence. Neither assignment of error has merit.

{¶ 30} Sufficiency and manifest weight are different legal concepts. However, manifest weight of the evidence may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2015-Ohio-1946, ¶ 11. Here, we find that Poole's convictions are supported by the manifest weight of the evidence and, therefore, that the evidence was sufficient.

{¶ 31} The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 32} Poole contends that the evidence did not demonstrate that he raped and kidnapped A.T. because (1) his picking her up and putting her in his car was not forceful because she did not resist and (2) the evidence did not show that he had sex with her, and even if it did, the evidence did not demonstrate that he knew how drunk she was. We are not persuaded.

{¶ 33} In regard to A.T.'s alleged lack of resistance, there is no requirement under Ohio law that a victim resist in order for a defendant's act to be forceful. *See State v. Malone*, 3d Dist. Marion No. 9-06-43, 2007-Ohio-5484, ¶ 23 ("we are aware of no requirement that the victim verbally resist."); *State v. Shannon*, 11th Dist. Lake Nos. 2002-L-007 and 2002-L-008, 2004-Ohio-1669, ¶ 94 ("a victim is not required to prove physical resistance in a rape prosecution.") Further, the amount of force required for kidnapping need not be overtly violent or threatening to the victim. *State v. Browder*, 8th Dist. Cuyahoga No. 99727, 2014-Ohio-113, ¶ 16. Moreover, this court has held that manipulation of an impaired person's clothing is sufficient evidence of the force element of rape. *State v. Walker*, 8th Dist. Cuyahoga No. 96662, 2011-Ohio-6645, ¶ 20.

{¶ 34} We also find no merit to Poole's second contention that the evidence did not show that he had sex with A.T., or that he did not know how drunk she was. After reviewing the entire record, including the video evidence, we find that the weight of the evidence in this case supports the convictions.

{¶ 35} The evidence shows that Poole interjected himself into a chaotic scene, and physically carried A.T. away. By all accounts, A.T. was intoxicated at the

time.  The video evidence shows this; all three of the neutral witnesses testified that she was; A.T. testified that she was the drunkest she had ever been; and her boyfriend testified that A.T. was the most intoxicated he had ever seen her.

{¶ 36} Given A.T.'s state at the time, Poole would have had to manipulate her "very tight-fitting skinny jeans" to have sex with her.  And the weight of the evidence supports that Poole did have sex with A.T.  We are not persuaded by Poole's citation to Dr. Heinig's testimony that it created reasonable doubt that he had sex with A.T.

{¶ 37} Dr. Heinig testified that she disagreed with the state's DNA analyst's conclusion that seminal material was in A.T.'s vaginal swab because, although the AP and P-30 tests, which Dr. Heinig testified are the tests used to detect semen on an item, were positive, given that the county lab did not find sperm on the vaginal swab in addition to those tests proved that semen could not be confirmed.  However, Dr. Heinig testified during her direct examination that positive results on these tests, even without the confirmation of sperm, could mean that semen is present.

{¶ 38} Dr. Heinig testified that when a differential extraction is done wherein the nonsperm fraction is separated from the sperm fraction, if there are no sperm present there she would not expect to find DNA there at all.  Despite that testimony, however, Dr. Heinig agreed with the county lab's finding of Poole's DNA being present in the sperm fraction of the vaginal swabs.  According to Dr. Heinig, this was an unexpected phenomenon that she believed occurred because when the county lab tested the swabs, some of Poole's nonsperm fraction DNA could have still been in the sperm fraction DNA without it being sperm or from seminal fluid.  Dr.

Heinig was unable to conclude whether the DNA from Poole in the sperm fraction of the vaginal swabs was from sperm or not. Dr. Heinig tested the boxer shorts A.T. was wearing and found sperm from Poole. She opined that the sperm found on the boxer shorts could have transferred DNA to A.T. without there having been sexual contact between Poole and A.T.

{¶ 39} On cross-examination, however, Dr. Heinig admitted that it was possible that Poole had sexual intercourse with A.T., ejaculated inside her, and then put the boxer shorts onto A.T., and semen leaked from A.T.'s vagina onto the boxer shorts. Further, Dr. Heinig admitted that if Poole had ejaculated onto the boxer shorts she would expect the stains to look different than they did. She admitted that after intercourse, sperm will either die or leak out of a female's vagina within 48 to 72 hours, but could live indefinitely on an object like boxer shorts if the object is properly preserved.

{¶ 40} The trial court did not create a manifest miscarriage of justice by discounting Dr. Heinig's testimony. In contrast to Dr. Heinig's testimony, the county analyst testified that two tests were performed — the AP test and the P-30 test – to confirm the presence of seminal material. Both tests were positive, leading to the conclusion that Poole's seminal material was on A.T.'s vaginal swabs. The state's analyst explained that it is possible to have the presence of seminal material, which can only come from a male's prostrate organ, without seeing sperm in the samples. Further, the analyst testified that Poole's DNA was only identified in the sperm fraction of the swabs; it was not identified in the epithelial fraction.

{¶ 41} Dr. Heinig's office only tested the boxer shorts. Her testimony was speculative and the trial court was within its discretion to discredit it over the testimony of the county analyst who tested A.T.'s vaginal swabs.

{¶ 42} On this record, we find that the manifest weight of the evidence supports the convictions and, therefore, that there was sufficient evidence for the convictions. The first and second assignments of error are overruled.

## Modification of Kidnapping Conviction

{¶ 43} In his third assignment of error, Poole contends that the trial court should have found him guilty of second-degree — rather than first-degree — kidnapping, because he left A.T. in a safe place unharmed. His contention is without merit.

{¶ 44} The evidence here shows that after taking A.T., who was visibly intoxicated, away in his car and raping her, he dropped her off in the early morning hours on a public street in downtown Cleveland, wearing clothes that were too big for her and without shoes. She was still visibly intoxicated at that time, as can be seen in the video evidence once she arrived in the casino. In addition to having been raped, A.T. had visible injuries to her body, which were photographed at the hospital. Poole did not release her unharmed in a safe place. The third assignment of error is therefore overruled.

{¶ 45} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

PATRICIA ANN BLACKMON, P.J., and
RAYMOND C. HEADEN, J., CONCUR