[Cite as *State v. Redmond*, 2022-Ohio-3734.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 111138 |
| v. | : | |
| JONATHAN REDMOND, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 20, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-655230-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Debora Brewer, Assistant Prosecuting Attorney, *for appellee*.

The Goldberg Law Firm and John J. Dowell, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Jonathan Redmond ("Redmond"), appeals his convictions for rape and kidnapping, following a bench trial. Redmond challenges the sufficiency and weight of the evidence supporting his convictions, argues that he

received ineffective assistance of counsel, and maintains that the trial court did not properly advise him when he waived his right to a jury trial. For the following reasons, we affirm Redmond's convictions.

## I. Procedural History and Factual Background

{¶ 2} On February 12, 2021, Redmond was charged in a six-count indictment. Counts 1, 2, 4, 5, and 6 charged him with rape in violation of R.C. 2907.02(A)(2), and Count 3 charged him with kidnapping in violation of R.C. 2905.01(A)(4), all first-degree felonies.

{¶ 3} On March 11, 2021, a capias warrant was issued for Redmond for failure to appear at the arraignment. Following his arrest, Redmond pled not guilty to the indictment and was released on bond with court-supervised release, placed on GPS home-detention monitoring, and ordered to have no contact with the victim. Two months later, on May 12, 2021, the court granted Redmond's request for bond modification to remove GPS home-detention monitoring so that Redmond could resume working, but continued the other bond conditions.

{¶ 4} On June 30, 2021, the trial court held a pretrial hearing at which Redmond waived his right to a jury trial and executed a written jury waiver. Redmond again waived his right to a jury trial and executed a second jury waiver at a pretrial hearing held on November 15, 2021. The matter then proceeded directly to a two-day bench trial. The state called the victim, C.M.; C.M.'s mother A.R. ("mother"); S.T., a close family friend; Parma Police Detective Jonathan Fullerton

("Detective Fullerton"); and C.M.'s pediatrician, Dr. Kathryn Corrigan ("Dr. Corrigan").

{¶ 5} C.M. testified that on October 6, 2018, just before her seventeenth birthday, she visited her sister D.M. and D.M.'s boyfriend, Redmond, at their apartment in Parma. (Nov. 15, 2021, tr. 33, 67.) At that time, C.M. had been living with her mother. D.M., who is a year older than C.M., had recently moved out of their mother's house and began living with Redmond, who was then 25 years old. (Nov. 15, 2021, tr. 33, 35, 163, 232.) C.M. testified that she did not know Redmond very well. (Nov. 15, 2021, tr. 34, 53-54.) C.M. stated that while she was at the apartment, she and D.M. watched television for a period of time before D.M. left the apartment with two friends to pick up some LSD and go to a high school homecoming dance. (Nov. 15, 2021, tr. 39-40.) C.M. stated that D.M. left her a blunt to smoke. (Nov. 15, 2021, tr. 70.)

{¶ 6} C.M. testified that after D.M. left the apartment, Redmond came out of the bedroom and began talking to her in the living room, asking if she was in a relationship with anyone. (Nov. 15, 2021, tr. 40.) When asked on cross-examination if she was high at the time, C.M. replied that she never smoked the blunt D.M. left for her because it was extinguished sometime during her conversation with Redmond. (Nov. 15, 2021, tr. 70.) C.M. testified that at some point during the conversation, Redmond came over to where she was sitting on the couch, squatted down before her, and leaned in to kiss her. (Nov. 15, 2021, tr. 41-42.) C.M. recalled

that she "sucked in her lips" to avoid contact with Redmond's and told him, "No, you're dating my sister." (Nov. 15, 2021, tr. 41-42.)

{¶ 7} C.M. testified that Redmond then stood before where she remained sitting on the couch and offered her $300 if she could "make him cum." (Nov. 15, 2021, tr. 42.) C.M. stated that Redmond then exposed his penis, grabbed the back of her head, and thrust his penis into her mouth. (Nov. 15, 2021, tr. 42.) C.M. testified that she tried to pull it out and told Redmond to stop. (Nov. 15, 2021, tr. 42-43.) She testified that Redmond then pulled her pajama pants down partway, pushed her legs toward her chest, and began having vaginal intercourse with her on the couch. (Nov. 15, 2021, tr. 43, 45, 78.) C.M. testified that she told Redmond to stop "multiple times," (Nov. 15, 2021, tr. 74.), and recalled that he periodically looked out the patio window whenever he saw headlights shine into the living room. (Nov. 15, 2021, tr. 43.)

{¶ 8} During C.M.'s testimony, the state introduced a two-page, hand-drawn rendering of the apartment, which C.M. created when she first met with detectives following the incident ("exhibit No. 1"). (Nov. 15, 2021, tr. 108.) The first page of exhibit No. 1 shows two Xs drawn on the living room couch, one near the arm of the couch and another closer to the center of the couch. C.M. testified that these two Xs represented two different times Redmond had raped her on the couch. (Nov. 15, 2021, tr. 111.) C.M. recalled that she had been sitting near the arm of the couch (represented by the first X) when Redmond forced her to perform fellatio and then vaginally penetrated her.

{¶ 9} C.M. testified that while Redmond was vaginally penetrating her, she was crying, but "not noticeably loud." (Nov. 15, 2021, tr. 43-44.) She stated that at some point, Redmond stopped, and C.M. got up and went to the bathroom. (Nov. 15, 2021, tr. 44.) The first page of exhibit No. 1 shows that the apartment's only bathroom was located at the end of a hallway that opened beside the living room couch. (Nov. 15, 2021, tr. 112.) The second page of the state's exhibit No. 1 shows that the bathroom and the apartment's only bedroom share a wall, and the doorways of each room are adjacent to one another. (Nov. 15, 2021, tr. 112.) C.M. testified that as she opened the door to exit the bathroom, Redmond pushed her face-first against the wall of the doorway leading to the bedroom, held her there, and resumed vaginal intercourse with her from behind. (Nov. 15, 2021, tr. 44-45.) C.M. testified that while Redmond did not hold her "super tight," he kept her there and she could not get away. (Nov. 15, 2021, tr. 45.)

{¶ 10} C.M. testified that after "five to seven minutes" of vaginal intercourse in the hallway, Redmond then picked her up over his shoulder and carried her back to the living room couch (marked by the second X in the state's exhibit No. 1), where he placed her in the same crunched position as before, with her legs pressed against her chest, resumed vaginal intercourse, and began to "lick and spit on [her] vagina." (Nov. 15, 2021, tr. 45-46.) C.M. stated that she then broke down and started "loudly sobbing" and Redmond finally stopped. (Nov. 15, 2021, tr. 47.) C.M. testified that at some point during the incident, she had stopped saying "no" because Redmond was not listening. (Nov. 15, 2021, tr. 47-48.) She recalled that the entire incident

lasted "five to seven minutes," "the tail end of it [lasting] probably like a minute, maybe two." (Nov. 15, 2021, tr. 84.)

{¶ 11} C.M. testified that Redmond afterwards asked her to keep the incident between them. (Nov. 15, 2021, tr. 49.) She recalled sitting on the living room couch, texting her sister, waiting for her to return, and Redmond lying on the living room floor doing the same. (Nov. 15, 2021, tr. 49.) When asked on cross-examination why she had not immediately left the apartment, C.M. replied that she froze, did not want to be alone, and did not want her sister to suspect something had happened. (Nov. 15, 2021, tr. 88, 93.) C.M. recalled that D.M. appeared to be ill when she returned to the apartment and had proceeded directly to the bathroom to vomit. (Nov. 15, 2021, tr. 51) C.M. recalled leaving the apartment shortly after. (Nov. 15, 2021, tr. 51.) Redmond followed C.M. out of the apartment, saying "We're good, right[?]" and "Everything is okay." (Nov. 15, 2021, tr. 51.) When asked on cross-examination if she ever returned to the apartment after the incident, C.M. replied that she left that night without her shoes and may have returned the following morning to retrieve them. (Nov. 15, 2021, tr. 94, 116-117.)

{¶ 12} C.M. testified that she did not immediately tell anyone about the incident because she did not want to ruin her relationship with her sister or her sister's relationship with Redmond. (Nov. 15, 2021, tr. 52.) C.M. testified that she first told a family friend about the incident a few weeks after and informed her mother about it a week after that. (Nov. 15, 2021, tr. 54, 56.) C.M. recalled seeing Redmond three times after the incident, once at her uncle's house for pumpkin

carving; again at her mother's house on Halloween; and once more at her school play. (Nov. 15, 2021, tr. 98.) C.M. testified that after she told her mother about the incident, her mother urged her to file a police report and took her to the Parma police station. (Nov. 15, 2021, tr. 57.) C.M. recalled that she first reported the incident to the police in late 2018 or early 2019, and met with a female detective. (Nov. 15, 2021, tr. 58.) She recalled telling the detective that she was not sure she wanted to move forward with the case, and the detective informed her that the file would remain open for a period of time. (Nov. 15, 2021, tr. 57-58)

{¶ 13} S.T., a close family friend, testified that C.M. told her about the incident around Thanksgiving 2018. (Nov. 15, 2021, tr. 149.) C.M.'s mother testified that she learned about the incident after confronting C.M. about her grades the Sunday following Thanksgiving 2018. (Nov. 15, 2021, tr. 126.) She testified that C.M. was a strong student and C.M.'s teachers contacted her because C.M.'s grades were dropping. (Nov. 15, 2021, tr. 126.) When asked on cross-examination if C.M.'s grades had been dropping because of marijuana use, C.M.'s mother replied that C.M. did not have a marijuana problem, D.M. did, and she only later discovered that C.M. smoked marijuana. (Nov. 15, 2021, tr. 138-139.) She testified that on November 27, 2018, she went by herself to the Parma police station to file a report on C.M.'s behalf but was told that C.M. would need to be there. (Nov. 15, 2021, tr. 133.) She testified that C.M. was at first reluctant to file a report but eventually went with her to meet with Parma Police Detective Amanda Kaniecki ("Detective Kaniecki"). (Nov. 15, 2021, tr. 134.). C.M.'s mother recalled sitting in the police station lobby while C.M.

gave her statement to the detective, learning afterwards that the investigation would remain pending. (Nov. 15, 2021, tr. 134-135.) She also recalled taking C.M. to her pediatrician around the same time to get her tested for a suspected sexually transmitted disease. (Nov. 15, 2021, tr. 135.)

{¶ 14} Parma Police Detective Jonathan Fullerton ("Detective Fullerton") testified that the initial report of the incident was made through a crime-tip email in November 2018, and assigned to Detective Kaniecki, his partner. (Nov. 15, 2021, tr. 153.) Detective Fullerton stated that he did not have much involvement in the case at first. He recalled assisting in some research and identifying the date of the incident as October 6, 2018, based on C.M.'s statement to Detective Kaniecki that the incident had occurred the night of the homecoming dance. (Nov. 15, 2021, tr. 153.) Detective Fullerton testified that C.M. returned to the Parma police station in June 2020, and wanted to reopen the case. (Nov. 15, 2021, tr. 152.) Detective Fullerton stated that, at this point, the case had been suspended and Detective Kaniecki had been promoted to sergeant, so the case was then assigned to him. (Nov. 15, 2021, tr. 152, 155.) Detective Fullerton reviewed the case with C.M., spoke with S.T., and attempted to speak to Redmond, but Redmond declined to give a statement. (Nov. 15, 2021, tr. 154.) Detective Fullerton testified that following his interview with C.M. and conversation with S.T., he referred the case to the county prosecutor's office. (Nov. 15, 2021, tr. 155.)

{¶ 15} C.M.'s pediatrician, Dr. Kathryn Corrigan ("Dr. Corrigan"), testified that C.M.'s mother brought C.M. to see her on December 5, 2018, and waited in the

waiting room during the appointment. Dr. Corrigan's progress notes from this appointment were admitted into evidence as exhibit No. 2. Dr. Corrigan testified that C.M. informed her that she had been raped by her sister's 25-year-old boyfriend six weeks before; that she had been left alone in the apartment with Redmond for two hours, "during which time he was touching her, making her uncomfortable, and trying to get her to perform sexual acts for the Internet"; and that "she kept saying no, was crying and screaming." (Nov. 16, 2021, tr. 162-164.) Dr. Corrigan described C.M. as anxious and tearful as she related the incident. (Nov. 16, 2021, tr. 166.) She testified that C.M. tested negative for a sexually transmitted disease, (Nov. 16, 2021, tr. 168), and she referred C.M. for a psychological evaluation, after which C.M. was diagnosed with adjustment disorder, anxiety, and depression. (Nov. 16, 2021, tr. 165.)

{¶ 16} At the close of the state's case in chief, Redmond moved for judgment of acquittal pursuant to Crim.R. 29, arguing that in her "taped statement" to Detective Kaniecki, C.M. reported that Redmond had wanted to record their sex acts for the internet, and C.M. omitted this statement from her testimony. (Nov. 15, 2021, tr. 173.) Redmond argued that this inconsistency undermined C.M.'s credibility. The state responded that C.M. was never asked about the alleged inconsistency. The trial court denied the motion, as well as Redmond's request to consider C.M.'s recorded statement, because C.M.'s recorded statement to Detective Kaniecki was not admitted into evidence.

{¶ 17} The defense called one witness, C.M.'s sister D.M. D.M. testified that the day of the incident had not been the first time C.M. visited the apartment. She recalled one other time that C.M. had visited the apartment with a friend and smoked marijuana in the living room and that C.M. may have visited another time with their mother. (Nov. 16, 2021, tr. 186.) D.M. testified that their mother knew about D.M. and C.M.'s marijuana use and had smoked it with them. (Nov. 16, 2021, tr. 181-182.) D.M. testified that she suspected C.M. was high on marijuana the day of the incident but did not recall giving her a blunt because D.M. was being drug tested and had stopping using marijuana during that time. (Nov. 16, 2021, tr. 185.) On cross-examination, D.M. admitted that she had taken LSD that evening, which caused her to vomit when she returned to the apartment. (Nov. 16, 2021, tr. 188.) She also recalled that C.M. left the apartment shortly after D.M. returned but came back the following morning and remained in the apartment 20-30 minutes while Redmond was there. (Nov. 15, 2021, tr. 189-190.) D.M. testified that on October 17, 2018, a week and a half following the incident, C.M. and Redmond were playing with light sabers at a Halloween family gathering and D.M. recorded a video of it, as well as a video of C.M. putting Redmond's light saber in her mouth. (Nov. 15, 2021, tr. 194-195.) Three still images of these videos retained by D.M. were admitted into evidence as exhibits A, B, and C.

{¶ 18} Following the conclusion of the second day of trial, on November 16, 2021, the trial court found Redmond guilty of rape (Counts 1, 2, 4, 5, and 6) and kidnapping (Count 3). The matter proceeded to sentencing on November 23, 2021.

The trial court sentenced Redmond to four years in prison to be served concurrently "as to all counts," determined him to be a Tier III sex offender (the most severe classification), notified him that he would be subject to a mandatory five-year term of postrelease control, and credited him with 13 days in jail. This appeal followed.[1]

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 19} In his first assignment of error, Redmond argues that his convictions were not supported by sufficient evidence. Specifically, Redmond contends that there was insufficient evidence of force to support his convictions for rape and kidnapping.

{¶ 20} A challenge to the sufficiency of the evidence questions whether the state has met its burden of production. *State v. Swanson-Reed*, 8th Dist. Cuyahoga No. 110724, 2022-Ohio-1401, ¶ 12, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to support a conviction is a question of law. *Thompkins* at 386, 678 N.E.2d 541. "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Id.* When reviewing a sufficiency challenge, the reviewing court must examine the evidence admitted at trial and determine "whether such evidence, if believed, would convince

---

[1] On May 10, 2022, this court sua sponte remanded the matter to the trial court pursuant to App.R. 9(E) to correct the blanket sentence "as to all counts" that the trial court stated in its sentencing entry and restate the sentence for each count that it imposed at the sentencing hearing. On July 21, 2022, the trial court issued a corrected sentencing entry that imposed a four-year prison term for Counts 1, 2, 3, 4, 5, and 6, to be served concurrently, for a total prison term of four years. The trial court made no other changes to the sentencing entry.

the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Thompkins* at 386. The question is not "'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'" *Swanson-Reed*, 2022-Ohio-1401, ¶ 12, quoting *Thompkins* at 390.

{¶ 21} A rape conviction under R.C. 2907.02(A)(2) requires proof of "sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" includes vaginal intercourse, fellatio, and cunnilingus. R.C. 2907.01(A). A kidnapping conviction under R.C. 2905.01(A)(4) requires evidence that the defendant forcefully removed a person from one place to another or forcefully restrained the person's liberty to engage in sexual activity with that person against that person's will. "Sexual activity," in relevant part, means "sexual conduct" as that term is defined above. R.C. 2907.01(C).

{¶ 22} "Force," as used in the rape and kidnapping statutes, is defined as "any violence, compulsion, or constraint exerted by any means upon or against a person." R.C. 2901.01(A)(1). The amount of force needed to commit either crime depends on the age, size, and strength of the parties and their relation to each other. *State v. Heard*, 8th Dist. Cuyahoga No. 107777, 2019-Ohio-2920, ¶ 20 (rape in

violation of R.C. 2907.02(A)(2)); *State v. Browder*, 8th Dist. Cuyahoga No. 99727, 2014-Ohio-113, ¶ 16 (kidnapping in violation of R.C. 2905.01(A)(4)).

{¶ 23} Here, C.M. testified concerning Count 1 (fellatio) that Redmond stood before her while she sat on the couch, grabbed the back of her head, and thrust his penis into her mouth. (Nov. 15, 2021, tr. 42.). She testified that she tried to pull it out and "continuously" told Redmond "no" and "stop." (Nov. 15, 2021, tr. 42-43.) As for Count 2 (vaginal penetration), C.M. testified that after Redmond removed his penis from her mouth, he pulled her pants down, pushed her legs to her chest, and had vaginal intercourse with her. (Nov. 15, 2021, tr. 43, 45, 78.) She testified that Redmond continued though she told him to stop "multiple times." (Nov. 15, 2021, tr. 74.) C.M. also testified that she was crying. (Nov. 15, 2021, tr. 43-44.) Regarding Count 4 (vaginal penetration), C.M. testified that after the two incidents on the living room couch, she went to the bathroom, and when she emerged, Redmond pushed her against the wall from behind, held her there, and resumed vaginal intercourse with her. (Nov. 15, 2021, tr. 44.) C.M. testified that she could not get away. (Nov. 15, 2021, tr. 45.) Lastly, C.M. testified regarding Count 3 (kidnapping), Count 5 (vaginal penetration), and Count 6 (cunnilingus) that after holding her against the wall during vaginal intercourse outside the bathroom, Redmond picked her up over his shoulder and carried her back to the living room couch, where he resumed vaginal intercourse and began to "lick and spit on [her] vagina." (Nov. 15, 2021, tr. 46.) She testified that Redmond only stopped after she started "loudly sobbing." (Nov. 15, 2021, tr. 47.)

{¶ 24} Redmond argues that the sex was consensual. However, this argument is not supported by the record. At the time of the incident, C.M. was 16 years old and Redmond was 25 years old. C.M. testified that she "was scared"; Redmond "is a bigger and older person" than she is and was "dating [her] sister," (Nov. 15, 2021, tr. 73.) C.M. also testified that she "did not consent * * * never once consented" and said "no," "stop," and "you're dating my sister" "multiple times." (Nov. 15, 2021, tr. 73-75, 88.)

{¶ 25} Redmond also argues that C.M. "made no physical attempt to stop" these sex acts. Ohio's rape statute, however, provides that "[a] victim need not prove physical resistance to the offender in prosecutions under [the statute]." R.C. 2907.02(C). And "there is no requirement under Ohio law that a victim resist in order for a defendant's act to be forceful." *State v. Poole*, 8th Dist. Cuyahoga No. 107829, 2019-Ohio-3366, ¶ 33.

{¶ 26} Viewing the evidence in a light most favorable to the prosecution, we find that a rational trier of fact could conclude beyond a reasonable doubt that Redmond compelled C.M. to engage in each sex act by force sufficient to overcome her will and that his rape and kidnapping convictions are therefore supported by sufficient evidence.

{¶ 27} Redmond's first assignment of error is overruled.

### B. Manifest Weight of the Evidence

{¶ 28} In his second assignment of error, Redmond argues that his convictions are against the manifest weight of the evidence based on inconsistencies in C.M.'s testimony that undermine her credibility.

{¶ 29} Unlike a sufficiency challenge, which questions whether the state has met its burden of production, a manifest-weight challenge questions whether the state has met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins* at 390. "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins* at 387. "Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's?" *State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). When reviewing a challenge to the manifest weight of the evidence following a bench trial, we recognize the trial court is serving as factfinder:

> "Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in

evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."

*State v. Ferguson*, 8th Dist. Cuyahoga No. 108603, 2020-Ohio-3119, ¶ 22, quoting *State v. Bell*, 8th Dist. Cuyahoga No. 106842, 2019-Ohio-340, ¶ 41.

{¶ 30} Redmond first argues that C.M.'s testimony omits the nature of her interactions with him in the days and weeks following the incident. C.M. testified that she saw Redmond three times after October 6, 2018—at a pumpkin-carving party at her uncle's house, on Halloween at her mother's house, and at one of her school plays. (Nov. 15, 2021, tr. 98-99.) Redmond claims that their interaction was friendly on at least one of these occasions, as shown in exhibits A, B, and C, which are three still images of videos that D.M. testified she had recorded at her uncle's house on October 17, 2018. (Nov. 16, 2021, tr. 197.)

{¶ 31} Exhibit A is date- and time-stamped October 17, 2018, 8:24 p.m., and depicts C.M. and Redmond play fighting with light sabers in a kitchen area. Exhibits B and C appear to have been taken in a different location. Exhibit B depicts C.M. leaning toward the camera, her mouth near the tip of a light saber, and contains on its reverse side a handwritten date and time of October 17, 2018, 8:22 p.m., written by D.M. (Nov. 16, 2021, tr. 196.) Exhibit C depicts C.M. in the same room and position as exhibit B, but this time putting her mouth around the tip of the light saber. (Nov. 16, 2021, tr. 193-197.)

{¶ 32} Redmond argues that C.M.'s behavior in these images, particularly the sexual innuendo in exhibits B and C, casts doubt on her rape allegations.

Although the October 17, 2018 date on exhibit A does show that C.M. and Redmond were play fighting with light sabers a little more than a week following the incident, the behavior to which Redmond directs our focus in exhibit A has little bearing on whether C.M. consented to sex with Redmond on October 6. We also decline to accept Redmond's interpretation of exhibits B and C. Unlike exhibit A, exhibits B and C are not date- and time-stamped, appear to have been taken in a different location, and Redmond does not appear in either photo.

{¶ 33} Redmond next argues that C.M.'s testimony was inconsistent about the duration of the rape. Specifically, Redmond points to C.M.'s testimony on direct examination that the rape outside the bathroom lasted "five to seven minutes" and contends that it conflicts with her testimony on cross-examination that "[t]he whole thing was like five to seven minutes." (Nov. 15, 2021, tr. 45, 84.) But Redmond offers only part of C.M.'s testimony on cross-examination. C.M. testified that "[t]he whole thing was like five to seven minutes. So, like, after the bathroom, being back on the couch, that was the tail end of it, probably like a minute, maybe two." This testimony is not inconsistent. Each rape with which Redmond was charged could very well fit into the five-to-seven-minute duration that C.M. recalled.

{¶ 34} Redmond also points to C.M.'s testimony on direct examination that she did not say anything but was "crying," not loudly, but with "tears welling up in [her] eyes" when Redmond first penetrated her vaginally and contends that this testimony conflicts with her testimony on cross-examination that at this point she said "no," "stop," and "[y]ou're dating my sister" "multiple times." (Nov. 15, 2021,

tr. 43, 74.) However, Redmond overlooks that C.M. testified that at this point she was "[c]ontinuously saying, 'No, you're dating my sister. We should — you should not be doing this. Stop.'" (Nov. 15, 2021, tr. 42-43.) C.M. also testified that her words did not stop Redmond: "No clearly wasn't in his vocabulary, so I don't know why I would continue to use a word that wasn't comprehendible." (Nov. 15, 2021, tr. 48) C.M. further testified that she had "tried to be quiet and just tried to — like, just take it and leave." (Nov. 15, 2021, tr. 47.) We find no inconsistency in this testimony.

{¶ 35} Redmond next contends that C.M.'s testimony omits Redmond's attempts to get her to engage in sex acts that he wanted to post to the internet. Dr. Corrigan's testimony and exhibit No. 2 both reference C.M.'s statement that Redmond had wanted to record sex acts for the internet. But neither the state nor the defense asked C.M. about this statement. Redmond also points out that Dr. Corrigan's progress notes do not indicate that C.M. had been penetrated. Dr. Corrigan testified, however, that the purpose of the appointment was STD testing and that she did not expect to find any evidence of rape during her examination of C.M. because any physical signs of rape, such as bruising, would have healed by the time of the appointment. (Nov. 16, 2021, tr. 168.) These alleged inconsistencies are not well taken.

{¶ 36} Lastly, Redmond argues that C.M.'s decisions to remain in the apartment following the incident, return to the apartment the following morning, and delay reporting the incident for several months are inconsistent with her rape

allegations. While these are not inconsistencies, they do go to C.M.'s credibility. C.M. testified that she remained in the apartment because she froze and waited for her sister to return so that she could leave. (Nov. 15, 2021, tr. 49, 93.) She also testified that she thought that if she remained in the apartment, she could leave without anyone stopping her or suspecting anything was wrong or positioning her to say something about the incident. (Nov. 15, 2021, tr. 49-50.) C.M. further testified that she delayed reporting the incident because she did not want to ruin her relationship with her sister or her sister's relationship with Redmond and did not want to cause problems in her family. (Nov. 15, 2021, tr. 52.) C.M.'s testimony explains her actions following the incident.

{¶ 37} Therefore, after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the witnesses' credibility, we do not find that this is the exceptional case in which the evidence weighs heavily against the conviction or that in resolving conflicts in the evidence, the trial court clearly lost its way.

{¶ 38} Redmond's second assignment of error is overruled.

### C. Ineffective Assistance of Counsel

{¶ 39} In his third assignment of error, Redmond argues that he received ineffective assistance of counsel for counsel's failure to make compelling arguments during his Crim.R. 29 motion and failure to introduce impeachment evidence.

{¶ 40} To establish ineffective assistance of counsel, an appellant must establish "(1) deficient performance by counsel, i.e., performance falling below an

objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, ¶ 138, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Strickland* at 697.

{¶ 41} A licensed attorney is presumed to be competent, and a defendant claiming ineffective assistance bears the burden of proof. *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 35 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). "'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶ 42} "Trial counsel's strategic choices must be accorded deference and cannot be examined through the distorting effect of hindsight." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115, citing *Strickland* at 689 and *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992). "'Debatable trial tactics do not constitute [ineffective] assistance.'" *State v. Williams*, 8th Dist.

Cuyahoga No. 97730, 2012-Ohio-4277, ¶ 18, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). Whether or how to impeach a witness is a trial tactic. *Id.*; *State v. Artis*, 6th Dist. Lucas No. L-19-1267, 2021-Ohio-2965, ¶ 79. Speculation about the factfinder's possible reaction to trial counsel's strategy is insufficient to demonstrate prejudice. *Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 142.

{¶ 43} Redmond argues that counsel's Crim.R. 29 motion failed to set forth the elements of each offense to demonstrate that the state failed to meet its burden of production. As we found after reviewing Redmond's first assigned error, however, the state produced sufficient evidence supporting the elements of each charged offense. Therefore, Redmond was not prejudiced by any alleged failure on the part of counsel to make a more thorough sufficiency argument in his Crim.R. 29 motion. Instead, counsel chose to attack C.M.'s credibility, arguing that the state had failed to make its case because "[o]bviously the credibility of the victim is the issue here." (Nov. 16, 2021, tr. 175.) Counsel's decision to attack C.M.'s credibility is a trial tactic that does not constitute ineffective assistance. *See Williams* at ¶ 18.

{¶ 44} Redmond also argues that defense counsel failed to impeach C.M. by statements she allegedly made to Detective Kaniecki that Redmond wanted to record their sex acts for the internet. The state acknowledges that neither it nor defense counsel asked C.M. about her statement to Detective Kaniecki but maintains that Redmond speculates about the impact these statements would have had at trial.

{¶ 45} This alleged statement by C.M. was already before the court in exhibit No. 2 and through Dr. Corrigan's testimony that during their December 18, 2018 appointment, C.M. said that Redmond was "trying to get her to perform sexual acts for the Internet." (Nov. 15, 2021, tr. 164.) We struggle to see how introducing a similar statement that C.M. made to Detective Kaniecki would have changed the trial's outcome. *Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, 71 N.E.3d 1034, at ¶ 142. Furthermore, any evidence that Redmond contends his attorney should have introduced at trial, including C.M.'s alleged statement to the police, is not before this court. When an ineffective-assistance claim is based on evidence outside the record, the proper vehicle for raising the claim is a petition for postconviction relief, not a direct appeal. *State v. Fisher*, 8th Dist. Cuyahoga No. 108494, 2020-Ohio-670, ¶ 22; *State v. Allen*, 8th Dist. Cuyahoga No. 86065, 2006-Ohio-1841, ¶ 24. Redmond's ineffective-assistance claim cannot therefore be based on C.M.'s statement to Detective Kaniecki.

{¶ 46} Redmond's third assignment of error is overruled.

**D. Jury Waiver**

{¶ 47} In his fourth assignment of error, Redmond argues that the trial court failed to comply with R.C. 2945.05 by failing to confirm that Redmond fully understood all the rights he would be waiving by waiving his right to a jury trial.

{¶ 48} R.C. 2945.05 requires that a jury waiver be in writing, signed by the defendant, filed as part of the record, and made in open court after the defendant has had an opportunity to consult with counsel. To meet the "in open court"

requirement of R.C. 2945.05, "there must be some evidence in the record that the defendant while in the courtroom and in the presence of counsel, if any, acknowledged the jury waiver to the trial court." *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 49.

{¶ 49} A jury waiver must be voluntary, knowing, and intelligent. Crim.R. 23; *State v. Ruppert*, 54 Ohio St.2d 263, 375 N.E.2d 1250 (1978). "Waiver may not be presumed from a silent record," but "[i]f the record shows a jury waiver, the conviction will not be set aside except on a plain showing that the defendant's waiver was not freely and intelligently made." *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 37. "Moreover, a written waiver is presumptively voluntary, knowing, and intelligent." *Id.*

{¶ 50} Here, at two separate jury-waiver hearings, the first held on June 30, 2021, and the second held directly before trial on November 15, 2021, the trial court reviewed Redmond's right to a jury trial with him and confirmed in the presence of counsel that he had consulted with counsel, understood his rights, and wished to waive his right to a jury. The trial court stated on the record at each hearing that Redmond executed a written jury waiver in the trial court's presence and the waiver form was thereafter filed with the clerk's office. The record therefore reveals that Redmond's jury waiver was voluntarily, knowingly, and intelligently made.

{¶ 51} Redmond's fourth assignment of error is overruled.

{¶ 52} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 21 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

SEAN C. GALLAGHER, A.J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR