[Cite as *State v. Stewart*, 2024-Ohio-5802.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,            :

                                                  No. 113178

    v.                                          :

ANDRE STEWART,                             :

    Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:**  December 12, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-22-674889-A and CR-23-679230-A

---

### *Appearances:*

The Law Office of Jaye M. Schlachet, Jaye M. Schlachet,
and Eric M. Levy, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Chauncey Keller, Assistant Prosecuting
Attorney, *for appellee.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant, Andre Stewart ("Stewart"), appeals his convictions in Cuyahoga C.P. No. CR-22-674889-A and his sentence in Cuyahoga C.P. No. CR-23-679230-A.  Upon review, we affirm.

## I. Facts and Procedural History

{¶ 2} This appeal stems from Stewart's (d.o.b. July 1, 1978) interactions with T.B. (d.o.b. July 10, 2007) on May 22, 2022, after Stewart, a local hairdresser, had T.B. come to his apartment for a hair appointment. Stewart was arrested that same day, charged with rape two days later in the Cleveland Municipal Court, and subsequently boundover and indicted in Cuyahoga C.P. No. CR-22-670805 for three counts of rape and one count of gross sexual imposition. The case was continued four times for various reasons at Stewart's request.

{¶ 3} In October 2022, the State brought a new case against Stewart and dismissed Cuyahoga C.P. No. CR-22-670805. The 12-count indictment filed in C.P. No. CR-22-674889 included the four prior charges filed against Stewart and added eight new counts: Counts 1 through 3 charged Stewart with rape, first-degree felonies; Count 4 charged him with gross sexual imposition, a fourth-degree felony; Counts 5 through 7 charged Stewart with unlawful sexual conduct with a minor, third-degree felonies; Counts 8 through 11 charged him with illegal use of a minor in nudity-oriented material or performance, second-degree felonies; and Count 12 charged Stewart with kidnapping, a first-degree felony. Stewart failed to appear for his arraignment, which was continued in lieu of issuing a warrant at Stewart's request. Stewart retained defense counsel ("trial counsel") and pleaded not guilty to the indictment.

**A. Motion to Suppress Evidence**

{¶ 4} In response to the new indictment, Stewart immediately filed a motion to suppress the following evidence: (1) any evidence seized from his apartment; (2) any results of testing biological evidence; (3) any evidence contained in Stewart's cell phone; and (4) any derivative evidence from these sources.[1]

{¶ 5} Stewart claimed that he was shot shortly after T.B. left his apartment and that his cell phone was unlawfully seized by police while he was hospitalized. Stewart argued that defects in the search warrant affidavit and warrant itself mandated suppression. Stewart asserted that the affidavit,[2] executed by Cleveland Police Detective Theresa Cavett ("Cavett"), failed to explain why his cell phone "would contain evidence of Stewart's one-time garden variety sexual encounter with T.B. that he billed as a 'rape'" and relied on a "very sweeping generalization" that "criminals use cell phones." (Motion to Suppress, 10/18/22.) Stewart argued that the affidavit did not establish probable cause to conduct any search of his phone, let alone a search of the photographic and video files contained therein. Stewart also asserted that the affidavit and warrant lacked particularity and were overly broad

---

[1] Our discussion of Stewart's motion to suppress is limited to the facts relevant to cell phone evidence because Stewart only challenges the legality of the search and seizure of his cell phone on appeal.

[2] Stewart's motion to suppress states that the search warrant affidavit was to be filed separately under seal. The docket is silent as to whether this filing occurred. The affidavit was subsequently admitted as an exhibit at the motion-to-suppress hearing. The transcript notes that the hearing's exhibits were kept by the trial court judge. (Tr. 3, 179.) However, the affidavit is not included in the appellate record and was unable to be located by the clerk of courts' office.

because the documents sought access to all information in his phone and did not specify a time period for searching data or describe the files or images to be seized, "giving police *carte blanche* to go on a fishing expedition inside [his] cell phone." (Emphasis in original.) *Id.*

{¶ 6} The State opposed the motion arguing that there was probable cause to support the search of Stewart's cell phone because there had been numerous cell phone communications prior to and including the day of the reported sexual assault and there was a fair probability that the cell phone contained relevant information and evidence. The State further countered that the warrant was not overly broad because it contained a detailed list of the specific items to be searched and did not lack particularity because it was explicitly limited to the specific offense being investigated, i.e., rape, and to the specific victim of that offense, T.B.

{¶ 7} After three continuances due to the prosecutor's involvement in other trials, a hearing was held in February 2023 on Stewart's motion to suppress. Stewart called Detective Cavett, from the sexual assault and child abuse unit. Detective Cavett testified that she was the detective assigned to the case, which involved a singular allegation of sexual assault that occurred on May 22, 2022.

{¶ 8} Detective Cavett testified that Stewart's cell phone was seized within an hour or so of him being shot and taken to the hospital. She further explained that the phone was taken in a routine matter by responding officers because Stewart was arrested. Detective Cavett advised that even if Stewart's cell phone was in the Cleveland Police Department's possession, it would "absolutely not" be opened or

searched absent consent or a search warrant and, because Stewart did not give consent, the phone was not "crack[ed]" prior to the warrant being obtained. *Id.* at 94-95.

{¶ 9} The sources of the information Detective Cavett relied upon at the time she obtained the search warrant for Stewart's cell phone were the original rape police report of a 14-year-old victim, statements made to responding officers, and Stewart's jail calls. This information revealed that T.B. wanted to get his hair styled prior to his eighth-grade graduation; his mom set up the hair appointment with Stewart via text message; the specific sexual acts performed; the events that led to them; and Stewart's calls and texts to T.B.'s mother after he was shot. Finally, Detective Cavett knew of a handle or nickname for Stewart, "Dre Styles," but she did not know what kind of handle it was or how it was used.

{¶ 10} Detective Cavett secured additional information to support her belief that Stewart's cell phone contained evidence of the reported rape beyond what was included in the search warrant affidavit. Detective Cavett stated that T.B.'s mother reported that T.B. and Stewart were having conversations or exchanging text messages and a subsequent forensic interview of T.B. indicated that Stewart was in possession of his cell phone at the time of the offense. Detective Cavett explained that after the search warrant was obtained, T.B. was interviewed by a social worker at the Child Advocacy Center. During the interview, T.B. stated that he saw Stewart with his cell phone and "possibl[y] saw [Stewart] taking pictures during the sexual assault . . . during the rape." *Id.* at 99. T.B.'s statement during the forensic interview

led Detective Cavett to conclude that Stewart may have photographs or videos of T.B.

{¶ 11} Based on this information, Detective Cavett believed a search of Stewart's cell phone would corroborate the identity of the reported suspect, Stewart. Detective Cavett also sought videos or photographs from the day of the sexual assault, any related texts, and "for other possible child porn or any kind of videos, pictures" based on T.B.'s age and the accusations that were being made. *Id*. at 49. Detective Cavett further testified that, in her experience with the sex crimes unit, she encountered photographs or videos that were taken of sexual assaults involving children.

{¶ 12} Detective Cavett advised that a prosecutor drafted the search warrant affidavit for her based on the police report and conversations they had. She conceded that the affidavit was general and there was no language limiting the scope of the search. Detective Cavett also acknowledged that there was a large list of items that she requested access to: photos, videos, and a "full extraction of the phone" from the time it was first turned on to the present day, which could be several years' worth of material. (Tr. 48.) However, Detective Cavett explained that this was because she did not know the form or location of the information she was seeking; there were multiple areas where supporting or corroborating evidence of the reported crime could have been contained.

{¶ 13} Detective Cavett acknowledged that a few of the paragraphs in the affidavit did not mention Stewart's cell phone or discuss the connection between his

phone and the offense and one paragraph incorrectly referenced illegal drug trafficking, which she did not realize until that morning. She testified that "[i]t should say sexual activity, sex crimes, rape, something in that aspect." *Id.* at 105. Detective Cavett agreed that the affidavit provided no explanation as to why she believed that Stewart's phone records were likely to contain relevant information, other than a general statement that those involved in criminal activity will take photographs of themselves or others during the commission of crimes. While acknowledging this generalization, Detective Cavett explained that she worked in sex crimes and dealt with pictures and videos a lot and the statement still holds true for the specific crimes of rape and sexual assault.

{¶ 14} Detective Cavett advised that she took the search warrant to a judge, and they discussed the case for about 10 to 15 minutes. The judge did not express concern about the warrant. After obtaining the search warrant, Detective Cavett took Stewart's cell phone to Internet Crimes Against Children Task Force for extraction. Detective Cavett first searched for "this particular time" and located pictures and a video of T.B. and Stewart, at which point she "went outside of that time" and continued to scroll through Stewart's photographs looking for child pornography. *Id.* at 114. Detective Cavett indicated that she did not subpoena or obtain a warrant for the phone records of T.B. or T.B.'s mother.

{¶ 15} Stewart filed a post-hearing brief in support of his motion to suppress and a motion for leave to file additional exhibits.[3] Stewart asserted that the software used to extract information from his phone provides law enforcement with the option of selectively extracting appropriate data from a target phone and the Cleveland Police Department could have "tailored its search warrant and supporting affidavit to fit the facts of this case." (Motion, Mar. 10, 2023.) Stewart further argued that "[t]he State's philosophy that any suspect's phone is likely to include photos/videos of his crimes is constitutionally unworkable." *Id.*

{¶ 16} In March 2023, the trial court issued a judgment entry denying Stewart's motion to suppress. First, the trial court addressed Stewart's argument that Detective Cavett's affidavit in support of the search warrant failed to provide probable cause to believe that the cell phone's contents would include evidence of the alleged crimes, making the following factual findings and conclusions of law:

> Here, the issuing judge had information that the defendant had forced sexual conduct on a 14-year-old boy who had arranged an appointment to meet at the defendant's apartment for a haircut. It was reasonable to infer from this that there would be phone communications prefatory to the appointment. The judge also knew that Stewart had called and texted the complainant's mother shortly after the alleged incident, and it was reasonable to infer that evidence of the call and text would be found on Stewart's phone. The affidavit also describes Stewart telling the police that he left his apartment and was shot about five minutes

---

[3] Based on the record before us, it does not appear that the trial court ruled on Stewart's motion for leave to file additional exhibits. "When a trial court fails to rule on a pretrial motion, it is presumed that the court overruled it." *State ex rel. Scott v. Streetsboro*, 2016-Ohio-3308, ¶ 14, citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 223 (1994). As there is no docket entry granting or denying Stewart's motion, we presume that the motion was denied for the purposes of our review. We further note that Stewart does not assign error to the denial of this motion on appeal.

after the haircut ended; his phone may reasonably contain information contradicting this timeline.

Considering, therefore, all of this evidence, the judge who authorized the warrant had a substantial basis for concluding that Stewart's cell phone would probably contain evidence supporting the accusations against him.

(Judgment Entry, Mar. 29, 2023).

{¶ 17} Next, the trial court addressed Stewart's argument that the warrant was not particular enough to satisfy the Fourth Amendment because it failed to narrowly identify what the police were looking for in his cell phone. The trial court held that "the warrant was as particular as the circumstances allowed," finding:

In this case, it was known that Stewart had used his cell phone to arrange to have T.B. come to his apartment and then used it after the incident to communicate with T.B.'s mother. On those facts alone, investigators could not reasonably narrow the search to, for example, Stewart's text or phone features because there are many applications he could have used for these communications. Additionally, since he is a hair stylist, it is possible he would have, for example, taken pictures of the haircut to send to T.B.'s mother for her approval or for other legitimate reasons connected with his business, not to mention for illegitimate reasons in connection with the commission of a crime.

*Id.*

{¶ 18} Lastly, the trial court held that even if the initial search of Stewart's cell phone was unlawful, the inevitable discovery rule would permit the admission of the cell phone evidence, finding:

At some point in the investigation, T.B. told the police that Stewart had taken pictures of the event. Assuming probable cause was lacking based upon the facts supporting the June 1 warrant to search the phone, a credible statement to the effect that the defendant used his phone to photograph evidence of the crime would have undoubtedly provided an issuing magistrate with probable cause to justify a warrant.

> Moreover, the phone had already been lawfully seized in anticipation of a warrant and so was properly in the government's possession at the time the police learned that the phone was used to take pictures during or after the crime. As a result, whatever evidence was found in the search that Stewart contends was unlawful would inevitably have been found in a later search based upon the additional facts constituting probable cause.

*Id.*

### B. Motion for Continuance

{¶ 19} Stewart's jury trial was set to begin on Monday, April 3, 2023. On Friday, March 31, 2023, Stewart filed a motion for continuance. Stewart argued that trial counsel was indicted the previous day and charged with possession of underage pornography, amongst other charges related to "garden-variety drug possession," following a three-to-five month long investigation that commenced in December 2022. (Motion, Mar. 31, 2023). Stewart further asserted that a press release was issued regarding the indictment and footage and images of trial counsel were also released to the media. Stewart requested a 30-day continuance to "put some time between the State publicizing the prosecution of [trial] counsel and Stewart's case" and "give [trial] counsel the opportunity to show that the sex charge is unfounded." *Id.* Stewart claimed additional time was needed because "members of the jury pool [undoubtedly] saw the news . . . and it likely will be fresh in their minds." *Id.* Stewart also argued that "[t]he fact that [trial] counsel was just charged with a crime with some parallels to Stewart's case (i.e. underaged sex crimes) undoubtedly might preoccupy some jurors and leave them unable to give Stewart a fair trial." *Id.* Stewart's motion further noted that trial counsel encouraged Stewart to consider

whether he would prefer to substitute counsel and a continuance would allow Stewart to do so without the pressure of trial starting on Monday. The State did not file an opposition to Stewart's motion.

{¶ 20} On Monday, April 3, 2024, the scheduled trial date, both Stewart and trial counsel appeared late. Trial counsel advised that "[i]f the court orders us to proceed, . . . . I'm ready to" and noted that Stewart filed a motion to continue the trial on Friday. The trial court then addressed Stewart, asking if he was aware of the reasons trial counsel requested continuance and advising that trial counsel is presumed innocent and permitted to practice law while the indictment is pending. The trial court stated:

> [H]e's a legal professional, he's a lawyer, and I'm sure this is a matter of great concern to him, great importance to him, just as your indictment is of importance to you. I trust, however, that the same way as if perhaps [trial counsel] had a close family member who was struggling with a bad illness, or if he learned some bad news about his own health, something like that, maybe his house burned down, he had to deal with that, that, like all of us, he would do his best to deal with his personal life personally and not let it affect his professional life.

(Tr. 183.) Stewart responded in the affirmative, indicated his understanding, and advised that he was "still seeking — looking over the possibility of seeking other counsel." *Id.* at 184. The following exchange occurred:

THE COURT: A different lawyer?

[STEWART]: Possibly.

THE COURT: All right. Well, you got maybe a couple hours to do that because we're getting a jury up here. Your lawyer has moved to continue the case on grounds that he believes some jurors may have heard of his situation and might subtly or otherwise hold that against him and you. When we bring jurors up we will ask if they know or have heard of any of the participants and if any have, we will explore that. But I'm not going to introduce the case by telling the prospective jurors that the lawyer is under indictment. And I ask that the parties, counsel, nor you, Mr. Stewart, tell the jurors that. If a juror tells us that they have heard of [trial counsel's] problems, we'll speak to that juror about it. So, what I'm going to do is call up some prospective jurors and we will begin jury selection as scheduled.

*Id.* at 184-185.

{¶ 21} The trial court then inquired as to the number of witnesses each party may call. The State stated that it may call 20 to 25 witnesses while the defense advised that under five would be called. The trial court explained:

[I]n case you think I was hasty denying continuance of this trial, there is a couple reasons for it. First, this case under one number has been pending for a very long time. You are entitled to your day in court. Second, under one number or another. When it comes to [trial counsel's] situation, as I've been referring to it, keep in mind that the — well, first of all, keep in mind the presumption of his innocence. But the conduct set forth in the indictment, if it occurred, if it occurred, because he's presumed innocent, was some number of months ago as far as I understand. In other words, the only thing that has changed from a few months ago when he was probably given reason to believe that he was suspected of committing a crime or crimes is that that suspicion has borne itself out in the form of an indictment. So he's no more or less able to represent you competently than he was, in my mind, at the start of this case. I have every reason to believe that he could put his own personal situation aside and for the next several days represent you zealously and competently just as any other lawyer would. So that's the reason why I think that — I think it is important that you know what's going on with him, and you do, but I don't think it rises to the level of requiring this proceeding to be delayed any longer.

*Id.* at 189-190. The following discussion took place:

[STEWART]: Your Honor, can I ask you this. As you mentioned a few months ago as an extra case added to his other cases that he has to deal with along with mine, it does present a level of more work that he has to consider in defending himself as well as his other clients, so therefore, it would present somewhat of a delay. Would you take that into consideration in giving us a continuance on those grounds?

THE COURT: Here's my basic problem with the continuance. There is no way of knowing when that case is going to be resolved and how, that's for sure. And he's presumed innocent but let's assume for the moment that the prosecutor successfully proves the indictment against him. Then we have another problem entirely. Then he's disbarred. You need a new lawyer. This thing gets pushed down the road even further and even further.

[STEWART]: I'm concerned. I have concerns because it's been publicized, and, you know, this day in age we deal with public opinion, it does affect his livelihood, you know, clients that are considering hiring him or that's already hired, that's not —

[TRIAL COUNSEL]: That's not something you need to worry about.

[STEWART]: It affects his livelihood as well, so personally it does affect him personally as well as his professional situation and until it's decided ultimately, so for that reason, also I wanted to maybe take a little longer to have a careful consideration of that, too.

THE COURT: I think I understand what you're saying, but the way I would look at it is the analogy I made before, any lawyer at any time can have something going on in his or her personal life that is on their mind. And usually I'm talking about a bad thing. If it's a good thing, you know, I don't know, your kid got honor roll. Well, that doesn't distract you. So typically, we're talking about a bad thing, a negative thing in a person's person life that might distract or detract from their ability to focus on the job at hand. This week the job at hand for [trial counsel] is to represent you competently and zealously in this trial. I have every confidence that he will do so and the thing that gives me that confidence is everything we do, like we're doing right now, is going to be of record. So that if this — first of all, if the result of this trial winds up in your favor, then more power to you and more power to him. Everybody will say nice job. If the result, however, is not in your favor, then we will have three judges who are on a different court look at everything that happened beginning with right now, but look at

everything that happened and decide did he fall below the professional level of performance that is expected of him. And I suspect the answer to that is going to be no. If this case winds up with a verdict that is not to your liking, in other words, let's be frank about it, if you're found guilty of one, some, or all of these charges, I believe it will be based upon the evidence and not based upon [trial counsel] being either distracted or otherwise not able to perform his duties, because, like I said, all of us have stuff happening in our lives. This happens to be something that is public that I found out about and I thought it was worth making sure you knew about it, but I don't see where it justifies putting off the day when the State of Ohio either proves these charges beyond a reasonable doubt or you are exonerated and it's not guilty on all counts. It's just been hanging around for too long. We've continued — I think it's been continued at least twice already but I could be wrong on that. The point is I believe that you're going to get a fair trial, and that's what you're entitled to.

[STEWART]: I believe [trial counsel]. I just want to have a fair chance to decide if — to keep him as counsel or not based on what the decision is made on his behalf. I think that, you know, take a few hours to do, so applying unnecessary pressure when I'm already under pressure as to the level and the number of charges that I'm already currently facing on top of considering what my attorney is going through right now. That's a lot, your Honor, in just to decide — make these certain decisions suddenly, decisions placed on me within a matter of hours. And you seem to be a very fair and reasonable, logical judge, I appreciate you for that, and for that reason, why I'm asking of you to consider at least giving us a few days so I can deliberate fairly and, you know, just relieve myself of some of the pressure of this present —

THE COURT: Well, I will say I think you've had a few days because as I recall — well, I'll say this. It's worth mentioning for the oral record, today is a Monday. I think that I personally heard about this either Wednesday or Thursday of last week. Maybe it was Tuesday, something like that. My guess is that you would have heard about it at the same time or maybe even earlier. It's possible that [trial counsel] knew this was coming and he had private talks with you. He mentioned that this might be something that comes up. The point being I know at least you've had the weekend to think about it because he filed the motion on Friday basically setting forth the fact of the indictment in his case was grounds for continuance. And obviously you had to know about that.

[STEWART]: I didn't learn about it until Friday . . . Pretty much on my behalf, I just hope that you take a serious consideration, I'm not asking for elongated time frame, just consider giving us a few more days to deliberate, please.

THE COURT: Well, whether you believe it or not, I have given it some consideration, certainly since I heard about his situation as I've been calling it in the middle of last week. I'm definitely going to be attuned to what the jurors are saying in voir dire. I'm definitely going to be attuned to, at least in my own view, whether [trial counsel's] performance in the courtroom is up to professional standards which I expect it to be, but —

[STEWART]: As do I.

*Id.* at 190-196.

{¶ 22} The trial court then inquired as to the State's position on Stewart's motion. The State indicated that it did not oppose the motion, reiterating that trial counsel was charged with a similar count and emphasizing the publicity surrounding trial counsel's indictment. The trial court stated:

My prediction is nobody knows anybody and nobody knows anything. I think we, being in the legal community, view that table being in the office that is prosecuting [trial counsel] and of course [trial counsel] himself, are so fully focused on it that you can't step back and imagine the possibility that people don't know, but I need to be open to the possibility that there are jurors who have heard this story, have taken it to heart and are not as willing as all of us to afford [trial counsel] the presumption of innocence and then to make a leap if he's a criminal, imagine what his client must be, so I'm certainly open to when jury selection starts, reversing position on the idea of continuance. I just think it's — as long as everyone is fully aware of the situation, everyone — unless that is, and as long as none of us is the one to bring it up, I think we should be able to impanel a fair jury. But — well, I hate to say it this way, but we'll see how it goes once we bring up the jury.

*Id.* at 199.

{¶ 23} Trial counsel advised that while he was expecting the indictment for drug possession and other related charges, he "had no idea that there would be this headline count in the indictment alleging this one count of child pornography." *Id.* at 200. Trial counsel advised:

> My experience by discussing the facts of the case is that people have been very, including clients, very supportive as it related to the drug accusation but everyone is wondering about this other accusation, the Count 1, and that's the sort of like the big elephant in the room, and like I said, this guy has had a lot of parallels between that single accusation and a couple of the accusations he's charged with. And like I said, out of an abundance of caution I ask the Court to strongly consider, you know, continuing this trial. I would say my experience has been since Thursday, you know, there was obviously a lot of publicity but then it kind of dropped off quite a bit on Friday and I believe that, you know, 30 days out from now, it will be a distant memory. A lot of people, if they read it three business days or two business days ago, they probably won't even remember my name. But here it is, this indictment came on two days before this trial was scheduled and I, think it's way too close, so that's my position and thank you very much.

*Id.* at 200-201. The trial court replied that it was open to the continuance depending on what was heard from members of the public.

{¶ 24} Stewart repeated his concerns that the many news publications with a "massive following" were "constantly repeating the story" and publicizing pictures of trial counsel and it was a "smear campaign" and "one of the biggest scandals." *Id.* at 202-203. Stewart stated, "So it's kind of hard to ignore those facts and assume, you know, that a juror is not going to be familiar, even if they're not familiar with his name, they're going to be familiar with the fact that there is an attorney in trouble." *Id.* at 203. The trial court responded:

Well, here's what we'll do. Like I said, we will inquire of the jurors —
actually as I consider it, I will edit the jury questionnaire to include the
questions do you know, and then I'll list the three prosecutors,
Detective Cavett, your lawyer and you so that I'm not just saying do you
know [trial counsel] but I'm asking do you know these participants and
that will give them a chance, because they'll have seen him in open
court when they're introduced, they'll have heard his name, they'll see
it in writing again, that will give them a chance to consider, wait a
minute, I have heard of this guy and here's how I know him. They can
put it in writing privately and not affecting the other jurors. We'll see
how that goes.

*Id.* at 204.

{¶ 25} Stewart inquired as to whether the trial court could ask whether the

jurors were familiar with any of the media outlets that published trial counsel's story

and how often they tune in to those stations. The trial court advised that it would

include a question to the effect of "what news programs and TV stations do you

ordinarily watch, something like that" and advised that the lawyers could follow up

with further inquiries, cautioning that most jurors probably heard of those sources

and "knowing this particular story is a different thing." *Id.* at 205. The trial court

concluded: "[W]e'll do what we can to get to the heart of the matter. As I say, I'm

open, if it appears that we can't impanel a jury that's going to be fair to your lawyer

and therefore, fair to you as well." *Id.* at 205-206.

{¶ 26} The case was then called for trial and voir dire began. Notably, the jury

questionnaire included an inquiry regarding whether the jurors know or have heard

of any of the participants in the trial, listing the prosecutors, Detective Cavett, trial

counsel, and Stewart. The trial court advised that jurors would be questioned individually depending on the responses received.[4]

## C. Jury Trial and Sentencing

{¶ 27} Stewart's jury trial commenced in the afternoon of Tuesday, April 4, 2023. During opening statements, trial counsel claimed that there was a "consensual incident between Mr. Stewart and [T.B.] inside his apartment that afternoon," conceded that T.B. was "still within that prohibited age range," and hedged that T.B. was "pseudo sophisticated" and "a larger teen . . . trying to pass himself off as older than he was." *Id.* at 542-543, 546-547.

{¶ 28} The State offered numerous exhibits, including photographs of Stewart, T.B., and the crime scene taken by police or the sexual assault nurse examiner ("SANE"); Stewart's and T.B.'s clothing; Stewart's cell phone; text messages between Stewart, T.B.'s mother, and T.B.; photographs and videos of T.B. from Stewart's cell phone; a recording of the 9-1-1-call made by T.B.'s grandmother; T.B.'s medical and SANE records; Stewart's buccal swab; items found in Stewart's apartment; T.B.'s rape kit; search warrants; a DNA lab report; a cell phone extraction report and receipt; and body-camera footage. The State also called 12 witnesses, including T.B. and Cleveland Police Detective Colbert Stadden ("Detective Stadden").

{¶ 29} T.B. identified Stewart, who he knew as "Dray," as the person who styled his hair in May 2022 and on another occasion about two months prior. T.B.

---

[4] Issues concerning the jury selection process have not been raised on appeal.

testified that he was in the eighth grade when Stewart first styled his hair. T.B. described his first hair appointment at Stewart's apartment as "regular," although Stewart offered him a massage, which he refused and "didn't think nothing of" at the time. *Id.* at 806, 822. After reviewing cell phone records, T.B. recalled that he exchanged text messages with Stewart to schedule a second appointment to get his hair retwisted for school.

{¶ 30} T.B. testified that "at first it started as a regular hair appointment." *Id.* at 820-821. However, after his hair was washed and styled, Stewart again offered T.B. a massage. T.B. testified, "I can't really say I gave a clear response. . . . I went to the bathroom to get — to see what my hair looked like because I didn't see it. And that's when, you know, he was behind me when I was in the bathroom and he put his hands on my shoulder and offered me a massage in there." *Id.* at 828. T.B. explained that he laid down on a bed in Stewart's bedroom "in a position that somebody would give a massage in," "thinking it was going to be a normal massage." *Id.* at 828, 830. However, "it escalated from there . . . ." *Id.* at 830. T.B. testified that he saw Stewart with his phone when the massage started being "not normal" and asked if he was recording. *Id.* at 855-856. Stewart told T.B. that he was not, but T.B. later learned that Stewart had, in fact, videotaped and taken photographs. T.B. identified himself and Stewart in the videos and photographs found on Stewart's cell phone and explained the circumstances surrounding them. Trial counsel objected to the admission of the videos and photographs based on the grounds raised in Stewart's motion to suppress.

{¶ 31} T.B. also described the sexual acts that took place and advised that he did not say anything because "most people react different, you know, during shocking things and I'm froze at the point where — . . . I'm froze at the point of that moment," felt "anxious, scared," and was in "a lot" of pain. *Id.* at 833-834, 842. T.B. testified, "I don't really want to say no to him because he's way bigger than me at this point. And I don't really know what to do and I stated that I don't think I should be doing this." *Id.* at 841-842. Stewart stopped after T.B. told him, "I needed to go because my parents would get suspicious to try to get out of it." *Id.* at 843.

{¶ 32} T.B. testified that he went along with the conversations that followed because he "was still scared, anxious, you know, feeling weird." *Id.* at 845. T.B. then retrieved his clothing, declined a ride from Stewart, and left the apartment. T.B. testified that he did not leave sooner because he did not feel like he could: "I was still scared. I didn't know what else to do at that point because I didn't really — I didn't know what he was capable of, and again, he is bigger than me." *Id.* at 867. T.B. "started breaking down" after turning a corner to get to the apartment complex's elevator and making sure Stewart was not there. *Id.* at 846. T.B. called his mother and told her that he had just been raped. T.B.'s mother picked him up immediately, and they called the police. While T.B. was talking to the police, Stewart texted T.B., telling T.B. that he had been shot and asking if T.B. made it home. T.B. did not respond to those messages. T.B. was taken to the hospital by ambulance and examined by a SANE nurse. About a week later, T.B. was interviewed by a social worker and expressed that he was having difficulty processing what happened.

{¶ 33} Detective Stadden testified that he rode with Stewart, who had been shot, in an ambulance to the hospital. At that time, police had information that Stewart was a suspect in a reported sexual offense. Detective Stadden explained that he originally responded to the scene after a call for shots fired but was tasked with returning to the police department to meet with Stewart, the possible victim who "showed up to the district." *Id.* at 902. Detective Stadden testified:

> [DETECTIVE STADDEN:] When we pulled up to the district, the ambulance had Andre Stewart in the back of the wagon. I got in the back of the wagon to ride with him to the hospital.
>
> [THE STATE:] Now, at this point what kind of information are you working on?
>
> [DETECTIVE STADDEN:] The information that we had at this point was the male that was shot, Andre Stewart, was a suspect in a sexual offense case that another two officers were investigating down the street . . .
>
> . . .
>
> [THE STATE:] Okay. And so are you receiving information from that other investigation as well?
>
> [DETECTIVE STADDEN:] Yes.

*Id.* at 903.

{¶ 34} Detective Stadden stated that when he first got into the ambulance, Stewart was on the phone, making and receiving calls, and texting people to notify them that he had been shot and was going to the hospital. Detective Stadden saw Stewart call T.B.'s mother and believed Stewart also called T.B., but there was no answer. Detective Stadden explained:

> We get to the hospital, he's taken out of the ambulance, they take him to the trauma room at the ER. He's being treated for his injuries. At this point I think he's still trying to make some phone calls but at this point in the investigation, detectives didn't want him to have his phone, so that was put away with his property. After his initial treatment, he's taken to another room where he's there the rest of the night until he's discharged.
>
> . . .
>
> [I]t's standard [that the detective didn't want him to have his phone and that it was taken away from him] because they were investigating a sexual assault of a juvenile and more likely than not there is evidence contained in a suspect's phone, so those are typically held for evidence.

*Id.* at 905-906. While at the hospital, Detective Stadden got word from a supervisor that Stewart was going to be placed under arrest. Detective Stadden informed Stewart of his legal rights by Mirandizing him and asked whether he wanted to discuss the sexual offense allegations. Stewart agreed to talk. When Detective Stadden asked Stewart about T.B.'s age, Stewart said he was "young" and agreed that he was "a teenager." *Id.* at 911. Stewart told Detective Stadden that "there was no sexual offense at all," he "did [T.B.'s] hair and that was it." *Id.* at 914, 916. Notably, Detective Stadden testified:

> [DETECTIVE STADDEN:] [Stewart] said that he did his hair, they were watching a show, Project Runway, and that [T.B.] was discussing with him how excited he was to go to high school, that he had done good enough, got past — got good enough grades to be able to go to high school.
>
> [THE STATE:] So Mr. Stewart's exact words were that he was discussing with [T.B.] about how excited T.B. was to be going to high school?
>
> [DETECTIVE STADDEN:] Correct.

[THE STATE:] Those are his exact words?

[DETECTIVE STADDEN:] Yes.

*Id*. at 916.  Detective Stadden's body-camera footage depicting this interaction with Stewart was admitted into evidence and played for the jury.  *See id*. at 1177-1179.

{¶ 35} After the State rested and the trial court denied Stewart's Crim.R. 29 motion for acquittal, the defense called Stewart as its witness.  Stewart testified that he "f[ound] T.B. attractive under the wrongful assumption that he was adult age" and thought T.B. was flirting with him during their second hair appointment.  *Id*. at 1210.  Stewart testified:

> [STEWART:] We discussed mainly just interests and what he planned to do after school since he was looking forward to his graduation coming up.
>
> [TRIAL COUNSEL:] What did he say about graduation?
>
> [STEWART:] How he was looking forward to going into high school. Between May and June is graduation period.  And I tend to get a lot of customers who get their hair done preparing for pictures, cap and gown, various events that come up around that period.
>
> [TRIAL COUNSEL:] Okay. When you say you said he was going into high school, I mean doesn't that tell you something about what age he might be, approximately?
>
> [STEWART:] No, not because — because of the way it translated perhaps, you know, after discovering the course of events that took place afterwards, I realized it was different but in the beginning I mistook, sometimes you may hear — I may hear something and it just didn't register the way it was implied at the time and I think that may have been the case with me and how we came into this situation.
>
> . . .

[TRIAL COUNSEL:] Your assumption that he was an adult, obviously once he says he's going into high school, that tells you [that] you got to learn more about his age, right?

[STEWART:] I think now over the course of events after observing what happened, and things really took place rapidly rather afterwards, I realized then, you know, perhaps I should have observed more and took time to ask more, but in defense of myself in that regard, sir, I don't run a club, so I always feel necessary to ask for people ID's to get their hair done per se unless they appeared underage.

[TRIAL COUNSEL:] But let's face it, you should have known better, right?

[STEWART:] I would agree.

*Id.* at 1216-1218. Stewart also admitted to taking photographs of T.B.:

[TRIAL COUNSEL:] As you're washing his hair, you took some photographs?

[STEWART:] I did, and I was wrong.

[TRIAL COUNSEL:] Don't. Come on.

[STEWART:] I was wrong.

[TRIAL COUNSEL:] You had no business doing that, that's one thing — you're my client, you agree with me you had no business doing that?

[STEWART:] I agree. I own it. I own it.

[TRIAL COUNSEL:] There is no one else to own it. You were the one that did it, it was totally —

[STEWART:] I agree. I totally agree, sir. And all I can say is it was wrong for me to take some pictures . . . I was wrong.

*Id.* at 1219. Trial counsel continued to question Stewart in this manner, having

Stewart admit to certain conduct and the wrongfulness of his actions. For example:

[TRIAL COUNSEL:] [Y]ou knew he was just going into high school, correct? Yes? Yes? Say yes. Come on.

[STEWART:] I would have to say, sir, it's a gray area. Again, I said I made a wrongful assumption and I just, looking back on things now, I probably should have inquired more.

[TRIAL COUNSEL:] Definitely, yes.

*Id.* at 1224-1225. Stewart testified that T.B. omitted certain details and testified to things that were untrue. Stewart described his version of events in detail, claiming that there was "[n]o pushing, no forcing whatsoever" and T.B. "knew what he was doing," "was putting enthusiasm into this," and "left on a good note." *Id.* at 1232, 1236-1237, 1239, 1245. At the end of Stewart's direct examination, the following dialogue occurred between Stewart and trial counsel:

[TRIAL COUNSEL:] All right. Between you and me, I want to — I apologize, I was trying to push you along. You and I, we've been attorney/client for about ten months now, right? About ten months?

[STEWART:] Yes, sir.

[TRIAL COUNSEL:] And you and I, we've had debates about how to — the speed of the conversations and details and moving things along, right?

[STEWART:] Absolutely.

[TRIAL COUNSEL:] Okay. And I apologize to you, I hope you know I wasn't trying to put you on the spot, give you a hard time of things. I'm trying to get to the heart of the matter, you understand that?

[STEWART:] Yes, sir. Yes, sir.

*Id.* at 1245-1246. After Stewart's cross-examination, trial counsel "rehabilitated" Stewart on redirect in the following manner:

[TRIAL COUNSEL:] Just in case there's any confusion . . . are you trying to deny responsibility for having sex with an underaged person? Yes or no. Come on, yes or no, are you denying responsibility for what you did to this kid?

[STEWART:] I am not denying any responsibility. I've said several times I owned it and I hold myself accountable and I do regret it.

[TRIAL COUNSEL:] Second question, did you rape [T.B.]?

[STEWART:] No, I did not.

*Id.* at 1286. The defense rested and renewed its Crim.R. 29 motion for acquittal, which was denied by the trial court.

{¶ 36} On Friday, April 7, 2023, the jury was charged and closing arguments were made. Trial counsel began his closing argument stating:

This case has been about very important issues that we had to flesh out because of the rape accusation, but, you know, in some respects this case has been a waste of time. I would say since for months we've been — we're standing by ready and willing to admit to certain conduct, just like Mr. Stewart admitted to you today, but unfortunately we have a disagreement between our side and the prosecutor. Mr. Stewart committed some crimes but Mr. Stewart denies committing the crime of rape and that's really been the sticking point in this case for all these months. And Mr. Stewart got up there and he made your job very simple, okay.

*Id.* at 1337. Based on the evidence presented, trial counsel acknowledged that the jury "probably could find [Stewart] guilty of every one of the counts of unlawful sexual conduct with a minor, and of course the taking of photographs of someone who's under the age of 18" but "[t]he quantum of evidence . . . overwhelming suggest[ed] that . . . there's proof beyond a reasonable doubt there was no rape at all." *Id.* at 1338. Trial counsel emphasized:

> Just the very fact that Andre Stewart got up here and actually, you know, essentially confessed to well over a half dozen serious felonies should give you an idea of the kind of person he is. He's obviously very flawed, and you saw me when I was asking him questions, like just trying to kind of keep him on track, you know, because even now he's admitting something, he's trying to rationalize something in his mind that is clearly wrong. Okay. But, you know, admitting, you know, you have a problem and that's the first sign towards, you know, rehabilitation, coming clean about something like that. And he was doing his best as he can.

*Id.* at 1339. Trial counsel recounted and analyzed the evidence, arguing that "something mutual [was] happening between two people, not one person forcing another person"; T.B.'s version of events was "bizarre" and "doesn't make sense"; and Stewart should be found not guilty of kidnapping, gross sexual imposition, and rape. *Id.* at 1346, 1354. After the State's final closing argument, deliberations began.

{¶ 37} In the afternoon of Monday, April 10, 2023, the jury returned the following verdicts: not guilty of rape, as charged in Counts 1 through 3 of the indictment; not guilty of gross sexual imposition, as charged in Count 4; guilty of unlawful sexual conduct with a minor, as charged in Counts 5 through 7; guilty of illegal use of a minor in nudity-oriented material or performance, as charged in Counts 8 through 11; and not guilty of kidnapping, as charged in Count 12. Between the conclusion of his trial and sentencing hearing, Stewart's trial counsel was suspended from the practice of law by the Ohio Supreme Court and new defense counsel was appointed. The trial court sentenced Stewart as follows:

> The court imposes a prison sentence at the Lorain Correctional Institution of 4 years. This sentence includes: 18 months each on Counts 5, 6 and 7; and 4 years each on Counts 8, 9, 10 and 11. All of these sentences are ordered to be served concurrently with each other

— for a single prison term in this case of 4 years — but consecutively to the 12-month prison term on Count 1 in Case Number 679230,[5] for a net sentence in the two cases of 5 years.

(Cleaned up.) (Journal Entry, Aug. 17, 2023; Nunc Pro Tunc Entry, Aug. 22, 2023.[6])

Stewart was also determined to be a Tier II Sex Offender, requiring a 25-year registration period.

{¶ 38} Stewart appealed, raising four assignments of error for review.

**Assignment of Error No. 1**

The trial court erred and abused its discretion when it denied [Stewart's] motion to continue trial for [Stewart] to obtain new counsel where trial counsel had been indicted for drug use/possession and illegal use of minor in nudity material and appellant's constitutional right to counsel's undivided loyalty was jeopardized.

---

[5] In Cuyahoga C.P. No. CR-23-679230, Stewart was indicted in a five-count indictment stemming from an incident that occurred in March 2023. Stewart pleaded guilty to failure to comply, a fourth-degree felony, with the allegation that the offense was committed while fleeing after the commission of a felony, as amended in Count 1 of the indictment, and vandalism, a fifth-degree felony, as charged in Count 3. The remaining three counts were nolled. The trial court sentenced Stewart as follows:

The court imposes a prison sentence at the Lorain Correctional Institution of 18 months. This sentence includes 12 months on Count 1 and 6 months on Count Three, to be served consecutively to each other for a single prison term in this case of 18 months. The 6-month term on Count 3, however, is ordered to be served concurrently with the four-year prison term in Case Number 674889.

(Judgment Entry, Aug. 17, 2023). On appeal, none of Stewart's assignments of error contemplate Cuyahoga C.P. No. CR-23-679230; Stewart merely indicates that an aggregate five-year prison term was imposed between the two cases. Therefore, we focus our review on Cuyahoga C.P. No. CR-22-674889.

[6] The August 22, 2023 nunc pro tunc entry advised that Stewart's trial counsel was incorrectly named the original sentencing entry. The nunc pro tunc entry corrected this clerical error, indicating that Stewart was represented at the sentencing hearing by newly appointed defense counsel.

**Assignment of Error No. 2**

[Stewart's] convictions were due to the ineffective assistance of trial counsel in questioning Stewart and in closing arguments in violation of the Sixth Amendment to the United States Constitution.

**Assignment of Error No. 3**

Stewart was provided ineffective assistance by trial counsel in violation of the Sixth Amendment to the United States Constitution where counsel failed to make or renew his motion to suppress introduction of evidence obtained on Stewart's cellular phone or otherwise move for a mistrial when it was found that the phone was illegally seized.

**Assignment of Error No. 4**

The trial court erred when it denied [Stewart's] motion to suppress evidence found in his cellular phone based upon a defective search warrant.

For ease of analysis, we address Stewart's assignments of error out of order.

## II. Law and Analysis

**A.** Denial of Motion to Continue Trial

{¶ 39} In his first assignment of error, Stewart challenges the trial court's denial of his motion to continue trial. Stewart claims that a conflict of interest existed because the same prosecutor's office that was prosecuting Stewart was also prosecuting trial counsel for similar charges.

{¶ 40} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-

4544, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Under the abuse-of-discretion standard of review, an appellate court cannot substitute its judgment for that of the trial court. *State v. McFarland*, 2022-Ohio-4638, ¶ 21 (8th Dist.), citing *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

{¶ 41} When ruling on a motion for continuance, the trial court must weigh "any potential prejudice to a defendant" against "concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *Unger* at 67. In conducting this balancing test, a trial court should consider the following objective factors:

> [T]he length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the [requesting party] contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68. However, "'[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" *Id.* at 67, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

{¶ 42} Here, Stewart requested a continuance claiming that his right to a fair trial was impacted by the widespread publicity of trial counsel's indictment, which included a charge that paralleled some of Stewart's. Stewart requested a 30-day continuance so that the news would not be fresh in the jury pool's minds and the

similar charge could be proven meritless. The record reveals that the trial court had an extensive discussion with Stewart, trial counsel, and the State regarding these concerns prior to trial and raised its own concerns that Stewart's case was "hanging around for too long" due to continuances. The trial court indicated that trial counsel was presumed innocent, permitted to practice law, and a "legal professional" who "would do his best to deal with his personal life personally and not let it affect his professional life." The trial court addressed the publicity of trial counsel's indictment by adding an inquiry to the jury questionnaire as to whether the jurors knew or had heard of any of the trial's participants, listing the names of the prosecutors, Detective Cavett, trial counsel, and Stewart. The trial court resolved that jurors could be questioned individually during voir dire based on their responses to that inquiry. The trial court advised that while it predicted that "nobody knows anybody and nobody knows anything" and a fair jury could be empaneled, it would "see how it goes" and was open to reconsidering a continuance if necessary. Based on the record before us, no such circumstances presented themselves and the parties proceeded to trial absent objection.

{¶ 43} On appeal, Stewart does not challenge the voir dire process or argue that the trial court's solution to his original concerns was ineffective. Rather, Stewart now claims that trial counsel's indictment created a "unique conflict of interest," citing to *State v. Bryant*, 1985 Ohio App. LEXIS 8861 (6th Dist. 1985), in support of his argument. However, in *Bryant* the illegal conduct charged in defense counsel's indictment occurred when the defendant paid counsel's fee with cocaine

allegedly stolen by the defendant from the victims of the case in which defense counsel was representing him. *Id.* at 2-3. In its evaluation of whether trial counsel was ineffective, the Sixth District found that while these circumstances gave rise to an actual conflict of interest, there was no evidence in the record that the conflict adversely affected counsel's performance. *Id.* at 14-15. Bryant is clearly distinguishable from the instant case, where trial counsel's indictment was not intertwined with Stewart's and the facts and circumstances surrounding their charges were distinct and separate. We further decline to find that this case is analogous to the line of cases holding that a trial court abused its discretion in denying a continuance when a party was left without counsel. Trial counsel did not file a motion to withdraw on the eve of trial; instead, trial counsel advised that he was prepared to proceed, and both the trial court and Stewart agreed that trial counsel's performance was expected to be "up to professional standards."

{¶ 44} Despite the State's advisement that it did not object to the continuance, the trial court's reluctance to grant the motion, and its application of pressure upon Stewart to find a new attorney within hours of trial, we cannot say the trial court abused its discretion. In response to the concerns raised, the trial court added an inquiry to the jury questionnaire and stated that it would reconsider continuing trial if a fair jury could not be empaneled. When no issues arose during voir dire, the trial court made the decision to go forward absent any objection from the parties. Thus, the trial court's denial of Stewart's motion to continue was not unreasonable, arbitrary, or unconscionable. Accordingly, we find that the trial court did not abuse

its discretion in denying Stewart's motion for a continuance. Therefore, the first assignment of error is overruled.

## B. Denial of Motion to Suppress Evidence

{¶ 45} In his fourth assignment of error, Stewart challenges the trial court's denial of his motion to suppress the evidence found in his cell phone. Stewart argues that the trial court erred in denying his motion to suppress because the search warrant relied on a defective affidavit. Specifically, Stewart claims that the affidavit was "generic" and "cop[ied] and paste[d]." Stewart asserts that the "overgeneralized" affidavit failed to set forth specific facts linking Stewart's cell phone to the alleged sexual offenses and, therefore, did not establish probable cause to support the issuance of a search warrant. Stewart further claims that the affidavit contained false information, noting that one paragraph incorrectly referenced illegal drug trafficking. While the search warrant affidavit is not included in the appellate record, we are able to evaluate Stewart's assignment of error based upon the briefing of the parties, the motion-to-suppress hearing transcript, and the trial court's decision denying the motion to suppress.

{¶ 46} Appellate review of a motion to suppress generally presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court is in the best position to evaluate the evidence and the credibility of witnesses and, therefore, assumes the role of trier of fact when considering a motion to suppress. *Id.* On appeal, an appellate court must accept the trial court's findings of fact as true so long as they are supported by competent,

credible evidence. *Id.* The appellate court must then apply the de novo standard of review to the trial court's conclusions of law, independently determining whether the facts satisfy the applicable legal standard without deference to the trial court's legal conclusions. *Id.*

{¶ 47} The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution guarantee "the right of people to be secure in their persons, houses, papers, and effects [or possessions], against unreasonable searches and seizures." These constitutional protections provide that a warrant can be issued only if probable cause for the warrant is supported by an oath or affirmation and particularly describes the place to be searched and the persons or things to be seized. U.S. Const, amend. IV; Ohio Const. art. I, § 14. *See also* Crim.R. 41(C); R.C. 2933.23. In deciding whether probable cause exists for the issuance of a search warrant, the issuing judge must make "'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983). Appellate courts "must accord great deference to the issuing judge's determination of probable cause." *Id.*

{¶ 48} The exclusionary rule provides that evidence obtained from an unreasonable search and seizure is considered "fruit of the poisonous tree" and must

be suppressed from use in the criminal prosecution of the person from whom it was obtained. *State v. Parrish*, 2023-Ohio-3356, ¶ 12 (8th Dist.), citing *State v. Boulis*, 2006-Ohio-3693, ¶ 12, 22 (8th Dist.). "'The purpose of suppression is not to vindicate the rights of the accused person, who may very well have engaged in illegal conduct, but to deter the state from such acts in the future.'" *Id.*, quoting *State v Stagger*, 2005-Ohio-4586, ¶ 11 (8th Dist.). Nor should the purpose of suppression be overshadowed by confirmation of the detained person's commission of an alleged criminal act. *Id.*, citing *State v. Byrd*, 2022-Ohio-4635, ¶ 32 (8th Dist.).

{¶ 49} Based on the information contained in the search warrant affidavit and testimony offered at the suppression hearing, the trial court found that the judge who issued the search warrant had a substantial basis for concluding that Stewart's cell phone would probably contain evidence supporting the accusations against him. The trial court further found that the warrant was as particular as the circumstances allowed. Lastly, the trial court noted that even if probable cause was lacking based upon the facts supporting the search warrant, the cell phone evidence would have been inevitably discovered.

{¶ 50} Without the ability to review the affidavit itself, we cannot say whether the language contained therein established probable cause to support the issuance of a search warrant. However, we can assess whether the evidence located in Stewart's cell phone would have inevitably been discovered. The inevitable-discovery exception to the exclusionary rule provides that "illegally obtained evidence may be admitted in a proceeding once the state establishes that the

evidence would inevitably have been discovered in the course of a lawful investigation." *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 27, citing *State v. Perkins*, 18 Ohio St.3d 193 (1985), paragraph one of the syllabus. The exception is "appropriately triggered only in those instances where there has been an implementation of police investigative procedures that ultimately would have led to the certain discovery of the same evidence [i.e.], the investigative procedures must have already been implemented prior to the discovery of the incriminating evidence through unconstitutional means." *State v. Blevins*, 2016-Ohio-2937, ¶ 40 (8th Dist.).

{¶ 51} Based on our review of the record before us, we find that the evidence Stewart seeks to suppress would inevitably have been discovered regardless of whether the affidavit established probable cause to support the search of Stewart's cell phone. The trial court found that at some point in the investigation, T.B. told police that Stewart had taken pictures of the reported sexual offenses. The trial court further found that Stewart's phone was seized in anticipation of a search warrant and was in the police's possession at the time they learned this additional information. These findings of fact are supported by competent, credible evidence in the record. Significantly, Detective Cavett's testified that a forensic interview, which took place after the cell phone search warrant was obtained, revealed T.B.'s belief that Stewart's cell phone was involved in the sexual assault.

{¶ 52} The trial court then concluded that, because these additional facts provided an issuing judge with probable cause to justify a warrant, any evidence

found in the initial search of Stewart's cell phone would have inevitably been discovered. We agree with the trial court's conclusion of law. The new information obtained regarding Stewart's possession of his cell phone during the commission of the reported rape indicated that there was a fair probability that evidence of the reported rape would be found in Stewart's phone. Because probable cause would have been established in a later search warrant that included this information, we find that the cell-phone evidence Stewart seeks to suppress would have inevitably been discovered in the course of a lawful investigation. Accordingly, the trial court did not err in denying Stewart's motion to suppress and his fourth assignment of error is overruled.

## C. Ineffective Assistance of Counsel

{¶ 53} In his second and third assignments of error, Stewart argues that he received ineffective assistance of trial counsel.

{¶ 54} "'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *State v. Powell*, 2019-Ohio-4345, ¶ 69 (8th Dist.), quoting *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.). As a result, "great deference" is afforded to trial counsel's performance and tactical decisions and trial strategies, even if "debatable," do not generally rise to the level of ineffective assistance. *State v. Harris*, 2022-Ohio-4630, ¶ 49-50 (8th Dist.), citing *State v. Scarton*, 2020-Ohio-2952, ¶ 89-90 (8th Dist.). Indeed, "[r]eviewing courts 'will ordinarily refrain from second-guessing strategic decisions counsel ma[d]e at trial,' even where trial

counsel's strategy was 'questionable' and even where appellate counsel argues that he or she would have defended against the charges differently." *Scarton* at ¶ 90, quoting *State v. Myers*, 2002-Ohio-6658, ¶ 152, and citing *State v. Mason*, 82 Ohio St.3d 144, 169 (1998) and *State v. Quinones*, 2014-Ohio-5544, ¶ 25 (8th Dist.).

{¶ 55} Because it is presumed that a licensed attorney is competent, a defendant claiming ineffective assistance bears the burden of proof. *Ohio v. Redmond*, 2022-Ohio-3734 (8th Dist.), citing *State v. Black*, 2019-Ohio-4977 (8th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). To establish an ineffective-assistance-of-counsel claim, a defendant must demonstrate that (1) his or her "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance, the first prong of the *Strickland* test, requires a showing "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. Prejudice, the second prong of the *Strickland* test, requires "a reasonable probability that but for counsel's errors, the proceeding's result would have been different." *State v. Winters*, 2016-Ohio-928, ¶ 25 (8th Dist.), citing *Strickland* at 687-688 and *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus. The failure to prove either prong of *Strickland*'s two-part test makes it unnecessary for a reviewing court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

{¶ 56} Stewart claims that "the acts of trial counsel, including the egregious questioning of [Stewart] and inviting the jury to enter convictions fell below the wide

range of what could be considered reasonable professional assistance or what might be considered sound trial strategy." Based on our review of the record, it appears that trial counsel's approach to examining Stewart and making closing arguments was, in fact, a trial strategy intended to bolster Stewart's credibility. Indeed, it was noted on the record that trial counsel and Stewart debated and discussed the tactics used throughout his direct examination, including the speed of the conversations, the details included, and the appropriate way to move things along to get to the "heart of the matter." In closing arguments, trial counsel emphasized that Stewart admitted to certain wrongful conduct but could not admit to kidnapping, gross sexual imposition, and rape because the interactions between Stewart and T.B. were "mutual."

{¶ 57} The defense's trial strategy was clearly successful. Despite the arguments and evidence presented by the State, including T.B.'s own testimony that he had been raped, the jury acquitted Stewart of three counts of rape, all first-degree felonies; one count of gross sexual imposition, a fourth-degree felony, and one count of kidnapping, another first-degree felony. While Stewart was found guilty of three counts of unlawful sexual conduct with a minor and four counts of illegal use of a minor in nudity-oriented material or performance, Stewart has not demonstrated that he would have otherwise been acquitted of those charges, especially considering his admission to Detective Stadden, captured on body-camera footage, that T.B. was going into high school. Therefore, we cannot say that Stewart was prejudiced by trial counsel's conduct during his direct examination of Stewart and closing arguments,

regardless of whether that conduct amounted to deficient performance or mere unconventional trial tactics.

{¶ 58} Next, Stewart asserts that Detective Stadden's testimony that Stewart's cell phone was "put away with his property" while he was being treated at the hospital amounted to an illegal seizure of Stewart's cell phone prior to his arrest. Stewart claims that trial counsel was ineffective because he "fail[ed] to move to suppress the illegal seizure of the cellular phone, or, at minimum, seek a mistrial or striking of the same evidence once the information regarding the illegal seizure became available . . . ." Stewart argues that he was prejudiced by trial counsel's failure because the photos and videos that were the subject of his convictions would not have been admitted.

{¶ 59} Failure to file a motion to suppress constitutes ineffective assistance of counsel only when there is a reasonable probability that the motion would have been granted and that suppression of the challenged evidence would have affected the outcome of the case. *State v. Antio*, 2022-Ohio-1398, ¶ 19 (8th Dist.), citing *State v. Frierson*, 2018-Ohio-391, ¶ 17 (8th Dist.). Trial counsel is not required to file a motion to suppress if doing so would be a futile act. *Id.*, citing *State v. Musleh*, 2017-Ohio-8166, ¶ 31 (8th Dist.), and *State v. Armstrong*, 2016-Ohio-2627, ¶ 30 (8th Dist.). Similarly, failure to file a motion for a mistrial does not amount to ineffective assistance of counsel unless it is established that the trial court probably would have or should have declared a mistrial. *State v. Scales*, 2024-Ohio-2171, ¶ 39 (8th Dist.), citing *State v. Seiber*, 56 Ohio St.3d 4 (1990), citing *State v. Scott*, 26 Ohio St.3d 92,

95-96 (1986). Because there is no indication in the record that a motion to suppress would have been granted based on the seizure of Stewart's cell phone, or that a motion for a mistrial probably would or should have been granted, we cannot say that trial counsel was ineffective for failing to move for same.

{¶ 60} The record reveals that Detective Stadden knew that Stewart was a suspect in a reported sexual offense when he rode to the hospital with Stewart; observed Stewart communicating with multiple people, including T.B.'s mother; and believed he was also communicating with T.B. While at the hospital, Detective Stadden received word that Stewart was going to be placed under arrest. Detective Stadden Mirandized Stewart and spoke with him regarding the sexual offense allegations. Detective Stadden stated that Stewart's cell phone was "put away with his property . . . because [detectives] were investigating a sexual assault of a juvenile and more likely than not there is evidence contained in a suspect's phone, so those are typically held for evidence." Moreover, at the motion to suppress hearing, Detective Cavett testified that Stewart's cell phone was taken in a routine matter by responding officers when Stewart was arrested and a search did not occur until a warrant was obtained. Thus, it does not appear that a motion to suppress or a motion for a mistrial would succeed based on the record before us, even if the seizure occurred prior to Stewart's arrest. *See e.g.*, *State v. Parks*, 2020-Ohio-4524 (11th Dist.) (seizure of defendant's clothes and cell phone was not illegal where police had probable cause to arrest the defendant at the time the items were taken and a search of the cell phone was not conducted until after a search warrant was obtained); *State*

*v. Terrell*, 2002-Ohio-4913, ¶ 30 (8th Dist.) ("[T]he actual arrest need not precede the search as long as the fruits of the search are not used to support probable cause for the arrest."); *State v. Bing*, 134 Ohio App.3d 444, 447-448 (9th Dist. 1999) ("Where the police officer has probable cause to arrest independent of the items obtained in the search, but does not arrest until shortly after the search, the search is not offensive to the Fourth Amendment to the United States Constitution."). Accordingly, we decline to find that trial counsel performed deficiently and Stewart's second and third assignments of error are overruled.

**{¶ 61}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

ANITA LASTER MAYS, J., CONCURS;
FRANK DANIEL CELEBREZZE, III, J., CONCURS (WITH SEPARATE OPINION)

FRANK DANIEL CELEBREZZE, III, J., CONCURRING:

{¶ 62} I agree entirely with the opinion and resolution of the assignments of error. I write separately to express how troubled I am that appellant was not also convicted of the rape and gross sexual imposition charges. Separate from the facts of this case, I also write to convey my frustration with Ohio's current sentencing policies for sex offenders, particularly in cases with child victims.

{¶ 63} Appellant was charged with three counts of rape, involving both fellatio and anal sex. The rape and gross sexual imposition charges all contained an element that the sexual conduct was compelled by force or threat of force. Regarding the element of force, the jury was instructed as follows:

> Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.

> The force and violence necessary to commit a crime of rape depends upon the age, size and strength of the parties and their relation to each other. As long as it is shown that [T.B.'s] will was overcome by fear or duress, the forcible element of rape is established. And the threat does include a direct or an indirect threat. And the prosecution is not required to prove that [T.B.] physically resisted the defendant.

{¶ 64} While I recognize and concede that this issue was not procedurally before us in this appeal, I believe that this case provides a textbook example of a jury "losing its way," and feel that it is necessary to rehash the evidence that the jury heard.

{¶ 65} T.B. testified that he was afraid of appellant and that he was frozen in fear. He was 14 years old at the time, and appellant was 44. T.B. was alone in the fifth-floor apartment with a man he barely knew. As the prosecuting attorney stated

during her closing argument, T.B. was essentially placed in appellant's care during the time he was at his residence because he did not have a parent present while he was at appellant's house.

{¶ 66} T.B. testified that appellant offered to massage him. T.B. was on the bed, and appellant was on top of him. Appellant massaged very low on his back and eventually pulled T.B.'s pants and underwear down his legs. T.B. testified that he was anxious, scared, and basically frozen at that point. Appellant then pulled him down more on the bed and took his clothes all the way off and sexually assaulted him.

{¶ 67} T.B. stated that, at one point, appellant told him to get up and go into the bathroom. When appellant came into the bathroom he was not wearing clothes and "made [T.B.] suck his penis." T.B. testified that during this forced act of fellatio, he vomited on the floor and on appellant.

{¶ 68} T.B. described how they returned to the bedroom, and appellant positioned him for anal penetration. Again, T.B. stated that he was afraid, and testified that he did not "really want to say no to him because he's way bigger than me at this point." He told appellant that he "did not think I should be doing this," but he did not recall appellant's response.

{¶ 69} As set forth in the jury instructions, the State was not required to prove that T.B. physically resisted appellant. As this court has noted, "there is no requirement under Ohio law that a victim resist in order for a defendant's act to be forceful." *State v. Poole*, 2019-Ohio-3366, ¶ 33 (8th Dist.).

{¶ 70} The jury heard a recounting of the events in question from both T.B. and appellant, who testified in his own defense. The jury heard appellant continue to attempt to maintain that he was not aware that T.B. was a child even though he acknowledged that they had discussed T.B. beginning high school. Appellant also admitted to taking inappropriate pictures and videos of T.B. and conceded that he had had a problem in the past with taking pictures of individuals' posteriors without their knowledge.

{¶ 71} Given the size and age discrepancy along with the stark difference between T.B.'s testimony and appellant's often dubious testimony, the jury could have, and should have, found appellant guilty of all charges. I believe that the State was able to demonstrate that T.B.'s will was overcome by fear, and the force element was demonstrated.

{¶ 72} I have been a jurist for over 30 years and have seen far too many cases involving child victims of sexual abuse. One in three girls are sexually abused before the age of 18, and one in five boys.[7] The perpetrator is known to 90 percent of child sexual abuse victims.[8] Children are especially vulnerable to sexual violence, and in

---

[7] Lauren's Kids, *Facts and Stats About Child Sexual Abuse*, https://laurenskids.org/awareness/about-faqs/facts-and-stats/ (accessed November 26, 2024) [https://perma.cc/R9RL-Z9PB].

[8] *Id.*

Ohio, 47.9 percent of sexual violence victims are children.[9]  From 2016 to 2018, Ohio experienced a 41.3 percent increase in arrests for forcible rapes.[10]

{¶ 73} For these reasons, I implore the General Assembly to impose stricter penalties and sanctions upon offenders convicted of any sexual offenses, but particularly when those offenses are committed against child victims.  I would also advocate for a separate set of definite prison terms for sex offenses along with enhanced penalties where the offender was known to the victim.  Sex offense cases present unique and serious concerns that differentiate them from other felonies, and they should always be sentenced as such.  While I commend the General Assembly for its increased efforts to give a voice to victims of sexual abuse, these increased victims' rights have not proven to deter sex offenders or keep them off of the streets, where they are the most dangerous.

{¶ 74} Just to cite one example, an offender convicted only of sexual battery against a victim who is less than 13 years of age may receive anywhere from 2 to 8 years in prison.  R.C. 2907.03; 2929.14.  If the victim is over 13 years old, that sentence would be only 12 to 60 months.  *Id.*  Is 60 months enough to rehabilitate an offender who "engage[s] in sexual conduct with another . . ." by coercion, when the victim is under impairment, when the victim is not aware of the circumstances, or any of the other factors outlined in R.C. 2907.03?  Is 8 years enough if the victim

---

[9] Ohio Domestic Violence Network, Fact Sheet Sexual Violence, [https://perma.cc/HC24-XRNM].

[10] *Id.*

was under 13 years old? I do not have the answer to these questions, but the number of repeat sexual offenders I have seen during my time as a jurist suggests that the answer is a resounding "NO!" Sex offenses are a real and serious concern, and these offenses deserve individualized and enhanced definite prison terms separate and distinct from other felonies.

{¶ 75} While I wish the outcome of this case could have been different, I commend T.B. for his bravery throughout this matter, particularly in having to recount his experience under oath in open court with appellant only steps away. I hope and pray that this child victim takes advantage of the resources available to survivors of child sexual abuse and continues in the healing process.